**LAW OFFICES OF RAHUL WANCHOO**
Attorneys for Plaintiff
Empire State Building,
350 Fifth Avenue, 59th Floor
New York, New York 10118
Phone: (646) 593-8866
Fax:    (212) 618-0213
E-mail: rwanchoo@wanchoolaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

CROSSBOW CEMENT SA

                          Plaintiff,

              - against -

MOHAMED ALI SALEH Al-Hashedi &
BROTHERS

                          Defendant.

-------------------------------------------------------X

ECF CASE

08 Civ. 5074 (HB)

**DECLARATION OF RAHUL
WANCHOO IN OPPOSITION TO
DEFENDANT'S MOTION TO VACATE
MARITIME ATTACHMENT**

        RAHUL WANCHOO hereby declares the following pursuant to 28 U.S.C. § 1746:

1.      I am a member admitted to the Bar of this Honorable Court and I am a principal in the

firm of Law offices of Rahul Wanchoo, attorneys for Plaintiff, Crossbow Cement SA

(hereinafter "Crossbow" or "Plaintiff").

2.      I am fully familiar with the facts of this matter and submit this Declaration in opposition

of the motion to vacate maritime attachment filed by Defendant, Mohamed Ali Saleh Al-Hashedi

& Brothers (hereinafter "Al-Hashedi" or "Defendant").

3.      This action was brought by Crossbow in connection with a claim against Al-Hashedi for demurrage incurred on vessels, in the amount of $134,110.00 inclusive of interests, costs and reasonable attorneys' fees. A true and correct copy of Crossbow's Verified Complaint is attached hereto as **Exhibit A**.

4.      Pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime claims, Crossbow obtained an Ex parte Order of Maritime Attachment and Garnishment from this Court on June 3, 2008 directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment ("PMAG") against any funds or other assets of Al-Hashedi found within this Judicial District. A true and correct copy of the Ex Parte Order of Maritime Attachment dated June 3, 2008 is attached hereto as **Exhibit B**.

5.      Annexed hereto as **Exhibit C** is a true and correct copy of the Pro Forma Invoice dated July 27, 2005.

6.      Annexed hereto as **Exhibit D** is a true and correct copy of the GENCON charter party dated August 13, 2005.

7.      Annexed hereto as **Exhibit E** is a true and correct copy of the Final Arbitration Award dated December 6, 2006.

8.      I declare under the penalty of perjury that the foregoing is true and correct.

_____
Rahul Wanchoo

New York, New York
Dated: July 22, 2008

2

# EXHIBIT A





**08 CIV 5074**

**LAW OFFICES OF RAHUL WANCHOO**
Attorneys for Plaintiff
Empire State Building
350 Fifth Avenue, 59th Floor
New York, New York 10118
Phone: (646) 593-8866
Fax:    (212) 618-0213
E-mail: rwanchoo@wanchoolaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

CROSSBOW CEMENT SA

                                    Plaintiff,

                - against -                                    08 Civ. _____ (    )

                                                              **VERIFIED COMPLAINT**

MOHAMED ALI SALEH AL-HASHEDI &
BROTHERS

                                    Defendant.

--------------------------------------------------------X

        Plaintiff, CROSSBOW CEMENT SA ("Plaintiff"), by its attorneys, LAW OFFICES OF

RAHUL WANCHOO, alleges on information and belief as follows:

                        **JURISDICTION AND VENUE**

        1.        This is a case of admiralty and maritime jurisdiction within the meaning of Rule

9(h) of the Federal Rules of Civil Procedure, and within the admiralty and maritime jurisdiction

of the United States and of this Honorable Court. This case also falls under the Court's

admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333. Finally, this Court also has

jurisdiction over this matter because the action also arises under the convention on the

Recognition and Enforcement of Foreign Arbitral Awards, codified at 9 U.S.C. §201 *et. seq.*
and/or the Federal Arbitration Act, 9 U.S.C. §1 *et. seq.*

## THE PARTIES

2.     At all material times, Plaintiff was and now is a foreign corporation organized
under and existing by virtue of the laws of Geneva, Switzerland, and was the Seller of a cargo
of about 25,000 metric tons of Chinese bagged Portland cement.

3.     Upon information and belief, at all material times, Defendant, MOHAMED ALI
SALEH AL-HASHEDI & BROTHERS, ("Defendant") was and now is a foreign corporation
organized under and existing by virtue of the laws of the Republic of Yemen, and was the Buyer
of the cargo of cement.

4.     Plaintiff's claim arises out of and in connection with a sale contract dated July
27, 2005 ("Contract") pursuant to which Plaintiff shipped the cement on board the M.V.
SEABOSS 1 ("Vessel") under a maritime Congenbill incorporating the GENCON charter party
form for discharge at the port of Aden, Republic of Yemen.

## CLAIMS OF PLAINTIFF

5.     Pursuant to the Contract Plaintiff agreed to sell about 25,000 metric tons of
Chinese bagged Portland cement at a unit price based on free out discharge at Aden.  However,
at the request of the Defendant, Plaintiff agreed to discharge the cargo at the ports of Berbera
and Hodeidah and, accordingly, 5000 tonnes were discharged at Berbera and the balance at
Hodeidah.

6.     In performance of the Contract, Plaintiff incurred demurrage on the Vessel at
Berbera for 4.5 days at $20,000 per day or $90,000.00. In addition, Plaintiff also incurred
previous demurrage swith respect to the M.V. SAPANCA in the amount of $1,140.00. Thus,

2

Plaintiff's demurrage claim incurred under the Contract totals $91,140.00, which the Defendant has failed to pay despite due demand.

## THE ARBITRATION AWARD

7.      Disputes arising under the Contract were to be referred to arbitration in London in accordance with the GENCON charter party terms. Accordingly, Plaintiff submitted its dispute to arbitration in London before a sole arbitrator.

8.      In accordance with the Final Arbitration Award of the arbitrator dated December 6, 2006 ("Final "Award") (Exhibit A), Plaintiff is entitled to recover the following amounts:

|  |  |
|---|---|
| A. On the principal claim: | $91,140.00 |
| B. Accrued interest: 8% at 3-month rests, 10/25/05 – 05/29/08 | $20,665.00 |
| C. Costs of reference: (£5,600 @ $1.97504) | $11,060.00 |
| D. Interest on "C": 8% at 3 month rests 12/6/06 – 05/29/08 | $1,307.00 |
| E. Cost of Final Award (£4,500 @ $1.97504) | $8,888.00 |
| F. Interest on "E": 8% at 3-month rests 12/6/06 – 05/29/08 | $1,050.00 |
| Total Claim: | $134,110.00 |

9.      Defendant has not paid any of the above amounts.

10.     Defendant has not appealed from or otherwise moved to set aside the Final Award, and Defendant's time for doing so has passed.

11.     All and singular the premises are true and within the admiralty and maritime jurisdiction of this Honorable Court.

3

12.     Plaintiff brings this action by seeking an order of seizure of Defendant's goods and chattels, or credits and effects in the hands of garnishees to be named in the process, in the amount sued for herein, so that the Court shall have jurisdiction to enter a judgment upon the Final Award of the London arbitrator.

**WHEREFORE,** the Plaintiff prays the following:

1.      That process in due form of law according to the practice of this Court in causes of admiralty and maritime jurisdiction may issue against Defendant, Mohamed Ali Saleh Al-Hashedi & Brothers, that it be personally cited to appear and answer the matters set forth above;

2.      That if the Defendant cannot be found within this District, then that Defendant's goods and chattels, or credits and effects within the hands of garnishees within the jurisdiction of this Court be attached by process pursuant to Supplemental Rule B of the Federal Rules of Civil Procedure, Supplemental Rules for Certain Admiralty and Maritime Claims and in an amount sufficient to answer Plaintiff's claims of $134,110.00, the sum sued for in this Complaint;

3.      That a judgment be entered upon the Final Award of the aforesaid arbitration for the amount of any recovery by Plaintiff, together with interest, costs and disbursements of this action; and

4.      That this Court grants to Plaintiff such other and further relief as may be just and proper in the circumstances.

Dated: New York, New York
       June 3, 2008

                          **LAW OFFICES OF RAHUL WANCHOO**
                          Attorneys for Plaintiff
                          Crossbow Cement SA

                          By:  _Rahul Wanchoo_____
                               Rahul Wanchoo (RW-8725)

4

STATE OF NEW JERSEY)

                                                    ss.

COUNTY OF BERGEN   )

     I, Rahul Wanchoo, being duly sworn, deposes and says:

     I am an attorney at law and a member of the firm of Law Offices of Rahul

Wanchoo, attorneys for Plaintiff.

     I have read the foregoing Verified Complaint and know the contents thereof and

the same are true to the best of my knowledge, information and belief.

     The reason that this verification is made by me and not by Plaintiff is that Plaintiff

is a foreign corporation and is not within this District.

_Rahul Wanchoo_

Sworn to and subscribed to
before me this 2nd day of June, 2008.

_Michael D. Zeal_
Notary Public

Michael C. Zeale
Notary Public State of New Jersey
My Commission Expires
August 8, 2010

# EXHIBIT B

**LAW OFFICES OF RAHUL WANCHOO**
Attorneys for Plaintiff
Empire State Building
350 Fifth Avenue, 59th Floor
New York, New York 10118
Phone: (201) 882-0303
Fax:    (212) 618-0213
E-mail: rwanchoo@wanchoolaw.com

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: O6·O3·O8
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

CROSSBOW CEMENT SA

                              Plaintiff,

                - against -

MOHAMED ALI SALEH AL-HASHEDI &
BROTHERS.

                              Defendant.

-----------------------------------------------------------X

ECF CASE

08 CV _____ (____)

**EX PARTE ORDER OF**
**MARITIME ATTACHMENT**


      **WHEREAS**, on June 3, 2008 Plaintiff, CROSSBOW CEMENT SA filed a Verified

Complaint herein for damages amounting to $134,110.00 inclusive of interest, cost and

reasonable attorneys' fees, and praying for the issuance of Process of Maritime Attachment and

Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime

Claims of the Federal Rules of Civil Procedure; and

      **WHEREAS**, the Process of Maritime Attachment and Garnishment would command that

the United States Marshal or other designated process server attach any and all of the

Defendant's property within the District of this Court up to the amount of $134,110.00; and

**WHEREAS**, the Court has reviewed the Verified Complaint and the supporting affidavit, and the conditions of the Supplemental Admiralty Rule B appearing to exist, it is hereby

**ORDERED**, that Process of Maritime Attachment and Garnishment shall issue against all tangible or intangible property belonging to, claimed by or being held for the Defendant's by any garnishees within this District, including but not limited to, JPMORGAN CHASE BANK, UBS AG, CITIBANK, N.A., BANK OF NEW YORK, BANK OF AMERICA, HSBC BANK, DEUTSCHE BANK, WACHOVIA BANK, BARCLAYS, BNP PARIBAS, AMERICAN EXPRESS BANK, STANDARD CHARTERED BANK, DOHA BANK, and CALYON BANK and in an amount up to and including $134,110.00, pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure; and it is further

**ORDERED** that any person claiming an interest in the property attached or garnished pursuant to said order shall, upon application to the Court, be entitled to a prompt hearing at which the Plaintiff shall be required to show cause why the attachment and garnishment should not be vacated or other relief granted; and it is further

**ORDERED** that supplemental process enforcing the Court's Order may be issued by the Clerk upon application without further Order of the Court; and it is further

**ORDERED** that following initial service by the United States Marshal or other designated process server upon each garnishee, that supplemental service of the Process of Maritime Attachment and Garnishment, as well as this Order, may be made by way of facsimile transmission or by electronic mail to any garnishee; and it is further

2

**ORDERED** that service on any garnishee described above is deemed effective continuous service throughout the day from the time of such service through the opening of the garnishee's business the next business day; and it is further

**ORDERED** that pursuant to Federal Rule of Civil Procedure 5(b)(2)(D) each garnishee may consent, in writing, to accept service by any other means; and it is further

**ORDERED** that a copy of this Order be attached to and served with said Process of Maritime Attachment and Garnishment.

Dated: New York, New York
      June 3, 2008

_____
U.S.D.J.

# EXHIBIT C

FAX OUT

# CROSSBOW CEMENT SA

Swiss Trading Company for Portland Cements



Av(enue) de Frontenex

CH-1200 Geneva 8// Switzerland
Telephone: (022) 786 4511/77
Telefax: (022) 786 5979
Telex: 413 510 MERP CH

MOHAMED ALI SALEH AL-HASHEDI & BRO
PO BOX 5499

TAIZ / YEMEN REPUBLIC

## PRO FORMA
## INVOICE N° 07091/05

GENEVA, JULY 27TH, 2005.
PHE/BDD

FOR : ORDINARY PORTLAND CEMENT, QUALITY GB175-1999 GRADE 32,5R, PACKED IN STRONG POLYPROPYLENE BAGS (1 PLY KRAFT PAPER INNER), IN SLING-BAGS OF 40 BAGS EACH. ORIGIN : CHINA.

| | UNIT PRICE | TOTAL PRICE |
|---|---|---|
| QUANTITY : ABOUT 25.000 MT | US$ 72.— | US$ 1.800.000.— |
| SHIPMENT IN ONE LOT WITHIN ABOUT 35 DAYS FROM | PER MT CFR FREE | |
| NOTIFICATION DATE OF LC IN GOOD ORDER WITH | OUT ADEN (1 SAFE | |
| "CREDIT SUISSE" IN GENEVA/SWITZERLAND, | PORT). | |
| -ENGLISH LAW TO APPLY/LONDON ARBITRATION CLAUSE, | | |
| -DISCHARGING RATE : MINIMUM 1.500 MT PWWD PHEX UU, | | |
| -TIME TO START COUNTING AS PER "GENCON" C/P TERMS, | | |
| -DEMURRAGES : US$20.000 PER DAY OR PRORATA, PAYABLE | | |
| EVERY 3 DAYS IN ADVANCE, | | |
| -PAYMENT BY IRREVOCABLE CONFIRMED TRANSFERABLE | | |
| LETTER OF CREDIT PAYABLE AT SIGHT WITH "CREDIT | | |
| SUISSE" IN GENEVA/SWITZERLAND AGAINST PRESENTATION | CROSSBOW CEMENT SA | |
| OF : | | |
| -COMMERCIAL INVOICES, | | |
| -FULL SET OF 3/3 "CHARTER-PARTY" MARINE BILLS OF | | |
| LADING MARKED "FREIGHT PREPAID" "FREE OUT", | | |
| -ORIGIN CERTIFICATE, | | |
| -ANALYSIS CERTIFICATE, | | |
| -PACKING AND WEIGHT-LIST, | | |
| -INSPECTION CERTIFICATE FOR QUALITY/QUANTITY | | |
| ISSUED BY RELEVANT CHINESE AUTHORITIES. | | |
| -FORCE MAJEURE CLAUSE, | | |
| -5 PCT MORE OR LESS ALLOWED ON AMOUNT AND QUANTITY, | | |
| -CHARTER-PARTY B/L'S AUTHORIZED, | | |
| -ALL BANK CHARGES/CONFIRMATION/COMMISSIONS | | |
| OUTSIDE "CREDIT SUISSE" FOR APPLICANTS/OPENERS' | | |
| ACCOUNT, | | |
| -THIRD PARTY DOCUMENTS ACCEPTABLE. | | |
| -VALIDITY FOR CONFIRMATION : JULY 31ST, 2005. | | |
| -LAST TIME FOR LC OPENING : AUGUST 7TH, 2005. | | |
| ****************** | | |

2005
07
30

MOHAMED ALI SALEH AL-HASHEDI & BRO
M.A.S.H
TAIZ - YEMEN REPUBLIC

# EXHIBIT D

Adopted by
the Documentary Committee of the General
Council of British Shipping, London
and the Documentary Committee of The Japan
Shipping Exchange, Inc., Tokyo

| 1. Shipbroker | **RECOMMENDED** **THE BALTIC AND INTERNATIONAL MARITIME CONFERENCE UNIFORM GENERAL CHARTER (AS REVISED 1922 and 1976)** INCLUDING "F.I.O." ALTERNATIVE, ETC. (To be used for trades for which no approved form is in force) **CODE NAME: "GENCON"** Part I |
|---|---|

| | 2. Place and date |
|---|---|
| | AUGUST 13TH, 2005. |

| 3. Owners/Place of business (Cl. 1) | 4. Charterers/Place of business (Cl. 1) |
|---|---|
| Despondent Owners : SEAFREIGHTERS LINE INC PANAMA | CROSSBOW CEMENT SA GENEVA SWITZERLAND |

| 5. Vessel's name (Cl. 1) | 6. GRT/NRT (Cl. 1) |
|---|---|
| MV "SEABOSS 1" | 18174/ 10497 |

| 7. Deadweight cargo carrying capacity in tons (abt.) (Cl. 1) | 8. Present position (Cl. 1) |
|---|---|
| 30.810TDW | TRADING |

| 9. Expected ready to load (abt.) (Cl. 1) | |
|---|---|
| AUGUST 25TH, 2005 | |

| 10. Loading port or place (Cl. 1) | 11. Discharging port or place (Cl. 1) |
|---|---|
| 1/2 SAFE BERTH/S LONGKOU/CHINA | 1/2 SAFE BERTH/S ADEN |

| 12. Cargo (also state quantity and margin in Owners' option, if agreed; if full and complete cargo not agreed state "part cargo") (Cl. 1) |
|---|
| MIN/MAX 27.500 TONS OF BAGGED CEMENT (2 TONS SLING-BAGS) |

| 13. Freight rate (also state if payable on delivered or intaken quantity) (Cl. 1) | 14. Freight payment (state currency and method of payment; also beneficiary and bank account) (Cl. 4) |
|---|---|
| US$39.~ PER MT | SEE RIDER CL."18" |

| 15. Loading and discharging costs (state alternative (a) or (b) of Cl. 5; also indicate if vessel is gearless) | 16. Laytime (if separate laytime for load. and disch. is agreed, fill in a) and b). If total laytime for load. and disch., fill in c) only ) (Cl. 6) |
|---|---|
| FREE IN OUT STOWED | a) Laytime for loading SEE CLAUSE 6 PART II |
| 17. Shippers (state name and address) (Cl. 6) | b) Laytime for discharging SEE CLAUSE 6 PART II |
| | c) Total laytime for loading and discharging |

| 18. Demurrage rate (loading and discharging) (Cl. 7) | 19. Cancelling date (Cl. 10) |
|---|---|
| US$20.000 PER DAY OR PRORATA FOR ANY PART OF A DAY. | AUGUST 31ST, 2005. |
| 20. Brokerage commission and to whom payable (Cl. 15) | |

| 21. Additional clauses covering special provisions, if agreed. |
|---|
| RIDER CLAUSES 18 TO 38 BOTH INCLUSIVE. |

Copyright, published by The Baltic
and International Maritime
Conference (BIMCO), Copenhagen

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include Part I as well as Part II. In the event of a conflict of conditions, the provisions of Part I shall prevail over those of Part II to the extent of such conflict.

| Signature (Owners) Despondent Owners | Signature (Charterers) |
|---|---|
| SEAFREIGHTERS LINE INC. AS AGENTS | CROSSBOW CEMENT SA GENEVA SWITZERLAND  |

Printed and sold by S. Straker & Sons Ltd., 47-51 Gt. Suffolk Street, SE1. Tel: 01-928 8789 Tlx: 23358 Fax: 01-633 0261. by authority of The Baltic and International Maritime Conference, (BIMCO) Copenhagen.

15/07/2008  16:17    004122-7855979    CROSSBOW    PAGE  02/11

Case 1:08-cv-05074-HB    Document 16-5    Filed 07/23/2008    Page 3 of 12

PART II.
(AS REVISED 1922 AND 1976)
including "F.I.O." Alternative, etc.

CHARTER PARTY DATED 13TH OF AUGAST 2005 MV "SEABOSS I"

PART II.
(AS REVISED 1922 AND 1976)
Including "F.I.O." Alternative, etc.

17. General Ice Clause

Port of loading

(a) In the event of the loading port being inaccessible by reason of ice when vessel is ready to proceed from her last port or at any time during the voyage or on vessel's arrival or in case frost sets in after vessel's arrival, the Captain for fear of being frozen in is at liberty to leave without cargo, and this Charter shall be null and void.

(b) If during loading the Captain, for fear of vessel being frozen in, deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to any other port or ports with option of completing cargo for Owners' benefit for any port or ports including port of discharge. Any part cargo thus loaded under this Charter to be forwarded to destination at vessel's expense but against payment of freight, provided that no extra expenses be thereby caused to the Receivers, freight being paid on quantity delivered (in proportion if lump sum), all other conditions as per Charter.

(c) In case of more than one loading port, and if one or more of the ports are closed by ice, the Captain or Owners to be at liberty either to load the part cargo at the open port and fill up elsewhere for their own account as under section (b) or to declare the Charter null and void unless Charterers agree to load full cargo at the open port.

(d) This Ice Clause not to apply in the Spring.

Port of discharge

(e) Should ice prevent vessel from reaching port of discharge, Receivers shall have the option of keeping vessel waiting until the re-opening of navigation and paying demurrage, or of ordering the vessel to a safe and immediately accessible port where she can safely discharge without risk of detention by ice. Such orders to be given within 48 hours after Captain or Owners have given notice to Charterers of his impossibility of reaching port of destination.

(f) If during discharging the Captain for fear of vessel being frozen in deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to the nearest accessible port where she can safely discharge.

(g) On delivery of the cargo at such port, all conditions of the Bill of Lading shall apply and vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance of the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion.

251
252
253
254
255
256
257
258
259
260
261
262
263
264
265
266
267
268
269
270
271
272
273
274
275
276

277
278
279
280
281
282
283
284
285
286
287
288
289
290
291
292
293
294

## RIDER CLAUSES TO THE CHARTER PARTY DATED 13TH OF AUGAST 2005 MV SEABOSS I

### CLAUSE "18" –FREIGHT PAYMENT
97% FREIGHT LESS COMMISSIONS AND UNDISPUTED DESPATCH IF ANY TO BE PAID WITHIN 3 BANKING DAYS FROM SIGNING AND RELEASING BS/L MARKED "FREIGHT PAYABLE AS PER CHARTER PARTY" AND "CLEAN ON BOARD", IF CHARTERERS REQUIRED BILLS OF LADING MARKED "FREIGHT PREPAID" SAME NOT TO BE RELEASED UPON CHRTRS BANK CONFIRMATION TT FRT WAS IRREVOCABLY REMITTED TO OWNS BANK ACCT. FREIGHT DEEMED EARNED UPON SHIPMENT, DISCOUNTLESS AND NON RETURNABLE SHIP AND/OR CARGO LOST OR NOT LOST.

### CLAUSE "19" – HOLDS AND HATCHES
BEFORE COMMENCEMENT OF LOADING VESSEL'S HOLDS ARE TO BE CLEAN, DRY AND FREE OF SMELL TO SHIPPER'S SATISFACTION OR IN THE EVENT OF A DISPUTE TO THE SATISFACTION OF ANY MUTUALLY INDEPENDENT SURVEYOR, COST OF WHICH TO BE SHARED BETWEEN OWNERS AND CHARTERERS. IN CASE VESSEL'S HOLDS FALL TO PASS INSPECTION AT LOADING PORT THEN TIME NOT TO COUNT FROM SUCH FAILURE UNTIL THE HOLDS TO BE ACCEPTED AGAIN.

FIRST OPENING AND LAST CLOSING OF HATCHES TO BE FOR OWNER'S ACCOUNT, PROVIDED PORT LOCAL REGULATIONS PERMIT CREW TO DO SAME OTHERWISE TO BE FOR CHARTERERS ACCOUNT.

### CLAUSE "20" – CARGO OPERATIONS
IF VESSEL ARRIVING EARLIER AND CARGO READY LOAD SHOULD START EARLIER. ACTUAL TIME USED TO COUNT

CARGO TO BE LOADED WITHOUT SEPARATION PROVIDED ONE BILL OF LADING ISSUED ONLY. CARGO TO BE LOADED WITHOUT LASHING. KRAFT PAPER AS ON BOARD, ANY ADDITIONAL KRAFT PAPER/MATERIAL TO BE SUPPLIED BY CHARTERERS.

IF ANY RE-BAGGING REQUIRED, SAME TO BE FOR CHARTERERS / SHIPPERS EXPENSE AND LAYTIME TO COUNT.

DEMM/DISP, IF ANY, PBLE W/I 10 DAY AFTER RCPT OWNS CALC/SOF/NOR COPIES EVEN BY FAX

TALLY, IF ANY, TO BE FOR ACCOUNT OF PARTY ORDERING SAME. IF COMPULSORY OR ORDERED BY PORT AUTHORITIES SAME TO BE FOR CHARTERERS / RECEIVERS' ACCOUNT

### CLAUSE "21" – SHIFTING BETWEEN BERTHS
SHIFTING TIME BETWEEN BERTHS AT LOAD / DISCHARGING PORT TO COUNT AS LAYTIME. SHIFTING EXPENSES AT LOAD / DISCHARGING PORTS CHARTERERS'S ACCOUNT.

### CLAUSE "22" – PORT DISBURSEMENTS AND TAXES /DUES ETC.
AT LOAD PORT ALL DISBURSEMENTS TO BE FOR OWNERS' ACCOUNT INCLUDING TALLY WHEN COMPULSORY.

AT DISCHARGE PORT ALL DISBURSMENTS TO BE FOR OWNERS' ACCOUNT.

ANY TAXES / DUES / WHARFAGES / IN-OUTWARD COMMISSIONS ON CARGO / FREIGHT FOR CHARTERERS ACCOUNT BOTH ENDS.

### CLAUSE "23" – OVERTIME
OVERTIME TO BE FOR ACCOUNT OF PARTY ORDERING SAME. HOWEVER OVERTIME ORDERED BY PORT AUTHORITIES TO BE FOR CHARTERERS ACCOUNT. OFFICER'S AND CREWS OVERTIME ALWAYS TO BE FOR OWNERS ACCOUNT AT BOTH ENDS.

### CLAUSE "24" – STEVEDORE DAMAGE
STEVEDORE DAMAGE IF ANY TO BE SETTLED DIRECTLY BETWEEN OWNERS AND STEVEDORES, BUT CHARTERERS ARE ULTIMATELY RESPONSIBLE.

### CLAUSE "25" – NOTICES
MASTER OR OWNERS TO GIVE NOTICES ON FIXING AND THEN EVERY 24 HOURS NOTICES TO:

CHARTER PARTY DATED 13TH OF AUGAST 2005 MV "SEABOSS I"

-    GLOBAL OCEAN SHIPPING LONGKOU (AGENTS)
  PIC MR WANG  CHUNBO
  TEL 86 353 8810902/8810960 MOBILE 86 13805450292
  FAX 8810903
  EMAIL : GLOBALOCEAN@VIP.SINA.COM

-    'QINGDAO DONGPING MINMETALS'
  (PIC MR LI YIQING)
  FAX 86 532 5977938,
  E-MAIL : HENGLIAN@PUBLIC.QD.SD.CN

-    CHARTERERS AGENTS VIA BROKERS

NOR TENDERED BY FAX/TLX/CABLE/PH/ W/W/W/W 14/08 BE

## CLAUSE "26" – AGENT DETAILS
CHARTERERS AGENTS AT BOTH ENDS

LOAD PORT AGENTS:

-    GLOBAL OCEAN SHIPPING LONGKOU
  PIC MR WANG CHUNBO
  TEL 86 353 8810902/8810960 MOBILE 86 13805450292
  FAX 8810903
  EMAIL : GLOBALOCEAN@VIP.SINA.COM

DISCHARGE PORT AGENTS: TO BE NOMINATED.

## CLAUSE "27" – VESSEL'S DESCRIPTION
MV'SEABOSS I'
SINGLEDECKER, BULK CARRIER. SELF TRIMMING, GEARED CYP FLG-BLT 1975 DWT ABT
30,810 MT ON MAX SWD 10.637 MTRS GR/BL 1.365,260/1,315,003 CBFT
LOA/BM/DP: 178,20/26.80/14.70 M
SWINGING DERR 5 X 22 MT
5 HO/HA, MCGREGOR
GRT/NRT: 18174/10497
HOLDS DIMS ASF:
5HOLDS
TANKTOP DIMS: IN MTRS
N1: L26.80 X B 8 MTRS FRWRD - 20.40 AFT
N2: L26.80 X B 20.80
N3: L15.80 X B 20.80
N4: L26.20 X B20.80
N5: L26.50 X B20.80      FRWRD - 12.60 AFT
HEIGHTS: 13.50 MTRS

GR/BL HOLDS 1-5:
262755/252986
310922/299625
190313/180854
310931/299642
290339/281896
GRAND TTL GRAIN 1365260 / BL 1315003 IN CFT

MASTER AND CREW NATIONALITY: UKRANIAN
RMS CLASS
P+I CVRD- AMERICAN CLUB
HM INSURED VALUE+PLACE: INGOSTRAKH. VALUE USD3.000.000
LAST SS+DD : SEPT 2003
TPC: 39.8TNS

MANAGERS:

CHARTER PARTY DATED 13TH OF AUGAST 2005 MV "SEABOSS I"

BROUNS MARITIME LTD
TEL + 357-25-748722
FAX+ 357-25-345-838

CHART OPERATOR: IVAN
MOB: +357-99-778-408

OPERATION MANAGAER: CAPT ALEXANDER
MOB: +357-99-447-296
ALL ABOVE DETAILS ARE ABOUT

## CLAUSE "28" – SWITCH BILLS OF LADING
OWNERS AUTHORIZE CHARTERERS' AGENTS IF NEED AT BOTH ENDS TO ISSUE NEW SET OF BILL(S) OF LADING IN CONFORMITY WITH ORIGINAL ONES AT THEIR FULL RESPONSIBILITY IN EXCHANGE OF FIRST SET OF ORIGINALS ISSUED AT LOADING PORT. PRIOR SIGNING PRIOR SIGNING, RELEASING

THIS NEW ORIGINAL BILL(S) OF LADING CHARTERERS' AGENT TO FAX THE SAME TO OWNERS FOR APPROVAL AND RETURN FULL SET OF ORIGINAL BILL(S) OF LADING TO OWNERS. UPON WHICH

OWNERS AUTHORIZE SIGNING, RELEASING OF NEW SET(S). THE OLD ORIGINAL SET(S) TO BE THEN CONSIDERED NULL AND VOID.

CHARTERERS CONFIRM THAT SWISS BANK CORP. WILL RETURN ORIGINAL CANCELLED BILL(S) OF LADING TO THE OWNERS DIRECTLY  PRIOR TO ISSUANCE  OF THE NEW SET(S) OF BILL(S) OF LADING.

IN CASE CHARTERERS NEED FREIGHT PREPAID BILL(S) OF LADING FOR THE SECOND NEW SET BILL(S) OF LADING, SECOND NEW SET BILL(S) OF LADING TO BE ISSUED BY CHARTERES AGENT ONCE OWNERS' BANK CONFIRMS FREIGHT ACTUALLY RECEIVED.

## CLAUSE "29" – EXTRA INSURANCE
FREE EXTRA INSURANCE DUE TO VESSEL'S AGE / CLASS / FLAG / TYPE / OWNERSHIP / MANAGEMENT.

EXTRA WAR RISK INSURANCE FOR CHARTERERS ACCOUNT. ORDERS OF OWNERS WAR RISK UNDERWRITERS ARE ALWAYS TO BE FOLLOWED. ANY ADDITIONAL PREMIUM (WHICH TO BE ARRANGED BY OWNERS) FOR HULL AND MACHINERY AND OFFICERS/CREW FOR TRADING TO RESTRICTED AREA, INCLUDING BLOCKING AND TRAPPING INSURANCE AND CREW WAR BONUS TO BE FOR CHARTERER'S ACCOUNT.

## CLAUSE "30" – CANCELLING CLAUSE 2002 (CODE NAME: CANCELCON 2002)
(A) SHOULD THE VESSEL NOT BE READY TO LOAD (WHETHER IN BERTH OR NOT) ON THE AGREED CANCELLING DATE, THE CHARTERERS SHALL HAVE THE OPTION OF CANCELLING THIS CHARTER PARTY.

(B) SHOULD THE OWNERS ANTICIPATE THAT, DESPITE THE EXERCISE OF DUE DILIGENCE, THE VESSEL WILL NOT BE READY TO LOAD BY THE CANCELLING DATE, THEY SHALL NOTIFY THE CHARTERERS THEREOF WITHOUT DELAY STATING THE EXPECTED DATE OF THE VESSEL'S READINESS TO LOAD AND ASKING WHETHER THE CHARTERERS WILL EXERCISE THEIR OPTION OF CANCELLING THE CHARTER PARTY, OR AGREE TO A NEW CANCELLING DATE.

SUCH OPTION MUST BE DECLARED BY THE CHARTERERS WITHIN 48 RUNNING HOURS AFTER THE RECEIPT OF THE OWNERS' NOTICE. IF THE CHARTERERS DO NOT EXERCISE THEIR OPTION OF CANCELLING, THEN THIS CHARTER PARTY SHALL BE DEEMED TO BE AMENDED SUCH THAT THE SEVENTH DAY AFTER THE NEW READINESS DATE STATED IN THE OWNERS' NOTIFICATION TO THE CHARTERERS SHALL BE THE NEW CANCELLING DATE.

THE PROVISIONS OF SUB-CLAUSE (B) OF THIS CLAUSE SHALL OPERATE ONLY ONCE, AND IN CASE OF THE VESSEL'S FURTHER DELAY, THE CHARTERERS SHALL HAVE THE OPTION OF CANCELLING THE CHARTER PARTY AS PER SUB-CLAUSE (A) OF THIS CLAUSE.

CHARTER PARTY DATED 13TH OF AUGAST 2005 MV "SEABOSS I"

## CLAUSE "31" – CONFIDENTIAL CLAUSE
THIS FIXTURE TO BE PRIVATE AND CONFIDENTIONAL.

## CLAUSE "32" – P&I CLUB BUNKERING CLAUSE
THE VESSEL IN ADDITION TO ALL OTHER LIBERTIES SHALL HAVE LIBERTY AS PART OF THE CONTRACT VOYAGE AND AT ANY STAGE THEREOF TO PROCEED TO ANY PORT OR PORTS WHATSOEVER WHETHER SUCH PORTS ARE ON OR OFF THE DIRECT AND/OR CUSTOMARY ROUTE OR ROUTES TO THE PORTS OF LOADING OR DISCHARGE NAMED IN THIS CHARTER AND THERE TAKE OIL BUNKERS IN ANY QUANTITY IN THE DISCRETION OF OWNERS EVEN TO THE FULL CAPACITY OF FUEL TANKS, DEEP TANKS, AND ANY OTHER COMPARTMENT IN WHICH OIL CAN BE CARRIED WHETHER SUCH AMOUNT IS OR IS NOT REQUIRED FOR THE CHARTERED VOYAGE.

## CLAUSE "33" – DISPUTE RESOLUTION CLAUSES

(A) THIS CONTRACT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH ENGLISH LAW AND ANY DISPUTE ARISING OUT OF OR IN CONNECTION WITH THIS CONTRACT SHALL BE REFERRED TO ARBITRATION IN LONDON IN ACCORDANCE WITH THE ARBITRATION ACT 1996 OR ANY STATUTORY MODIFICATION OR RE-ENACTMENT THEREOF SAVE TO THE EXTENT NECESSARY TO GIVE EFFECT TO THE PROVISIONS OF THIS CLAUSE.

THE ARBITRATION SHALL BE CONDUCTED IN ACCORDANCE WITH THE LONDON MARITIME ARBITRATORS ASSOCIATION (LMAA) TERMS CURRENT AT THE TIME WHEN THE ARBITRATION PROCEEDINGS ARE COMMENCED.

THE REFERENCE SHALL BE TO THREE ARBITRATORS. A PARTY WISHING TO REFER A DISPUTE TO ARBITRATION SHALL APPOINT ITS ARBITRATOR AND SEND NOTICE OF SUCH APPOINTMENT IN WRITING TO THE OTHER PARTY REQUIRING THE OTHER PARTY TO APPOINT ITS OWN ARBITRATOR WITHIN 14 CALENDAR DAYS OF THAT NOTICE AND STATING THAT IT WILL APPOINT ITS ARBITRATOR AS SOLE ARBITRATOR UNLESS THE OTHER PARTY APPOINTS ITS OWN ARBITRATOR AND GIVES NOTICE THAT IT HAS DONE SO WITHIN THE 14 DAYS SPECIFIED. IF THE OTHER PARTY DOES NOT APPOINT ITS OWN ARBITRATOR AND GIVE NOTICE THAT IT HAS DONE SO WITHIN THE 14 DAYS SPECIFIED, THE PARTY REFERRING A DISPUTE TO ARBITRATION MAY, WITHOUT THE REQUIREMENT OF ANY FURTHER PRIOR NOTICE TO THE OTHER PARTY, APPOINT ITS ARBITRATOR AS SOLE ARBITRATOR AND SHALL ADVISE THE OTHER PARTY ACCORDINGLY. THE AWARD OF A SOLE ARBITRATOR SHALL BE BINDING ON BOTH PARTIES AS IF HE HAD BEEN APPOINTED BY AGREEMENT.

NOTHING HEREIN SHALL PREVENT THE PARTIES AGREEING IN WRITING TO VARY THESE PROVISIONS TO PROVIDE FOR THE APPOINTMENT OF A SOLE ARBITRATOR.

IN CASES WHERE NEITHER THE CLAIM NOR ANY COUNTERCLAIM EXCEEDS THE SUM OF USD 50,000 (OR SUCH OTHER SUM AS THE PARTIES MAY AGREE) THE ARBITRATION SHALL BE CONDUCTED IN ACCORDANCE WITH THE LMAA SMALL CLAIMS PROCEDURE CURRENT AT THE TIME WHEN THE ARBITRATION PROCEEDINGS ARE COMMENCED.

(B) NOTWITHSTANDING THE ABOVE, THE PARTIES MAY AGREE AT ANY TIME TO REFER TO MEDIATION ANY DIFFERENCE AND/OR DISPUTE ARISING OUT OF OR IN CONNECTION WITH THIS CONTRACT.

IN THE CASE OF A DISPUTE IN RESPECT OF WHICH ARBITRATION HAS BEEN COMMENCED UNDER THE ABOVE, THE FOLLOWING SHALL APPLY:-

(I) EITHER PARTY MAY AT ANY TIME AND FROM TIME TO TIME ELECT TO REFER THE DISPUTE OR PART OF THE DISPUTE TO MEDIATION BY SERVICE ON THE OTHER PARTY OF A WRITTEN NOTICE (THE "MEDIATION NOTICE") CALLING ON THE OTHER PARTY TO AGREE TO MEDIATION.

(II) THE OTHER PARTY SHALL THEREUPON WITHIN 14 CALENDAR DAYS OF RECEIPT OF THE MEDIATION NOTICE CONFIRM THAT THEY AGREE TO MEDIATION, IN WHICH CASE THE PARTIES SHALL THEREAFTER AGREE A MEDIATOR WITHIN A FURTHER 14 CALENDAR DAYS, FAILING WHICH ON THE APPLICATION OF EITHER PARTY A MEDIATOR WILL BE APPOINTED PROMPTLY BY THE

CHARTER PARTY DATED 13TH OF AUGAST 2005 MV "SEABOSS I"

ARBITRATION TRIBUNAL ("THE TRIBUNAL") OR SUCH PERSON AS THE TRIBUNAL MAY DESIGNATE FOR THAT PURPOSE. THE MEDIATION SHALL BE CONDUCTED IN SUCH PLACE AND IN ACCORDANCE

WITH SUCH PROCEDURE AND ON SUCH TERMS AS THE PARTIES MAY AGREE OR, IN THE EVENT OF DISAGREEMENT, AS MAY BE SET BY THE MEDIATOR.

(III) IF THE OTHER PARTY DOES NOT AGREE TO MEDIATE, THAT FACT MAY BE BROUGHT TO THE ATTENTION OF THE TRIBUNAL AND MAY BE TAKEN INTO ACCOUNT BY THE TRIBUNAL WHEN ALLOCATING THE COSTS OF THE ARBITRATION AS BETWEEN THE PARTIES.

(IV) THE MEDIATION SHALL NOT AFFECT THE RIGHT OF EITHER PARTY TO SEEK SUCH RELIEF OR TAKE SUCH STEPS AS IT CONSIDERS NECESSARY TO PROTECT ITS INTEREST.

(V) EITHER PARTY MAY ADVISE THE TRIBUNAL THAT THEY HAVE AGREED TO MEDIATION. THE ARBITRATION PROCEDURE SHALL CONTINUE DURING THE CONDUCT OF THE MEDIATION BUT THE TRIBUNAL MAY TAKE THE MEDIATION TIMETABLE INTO ACCOUNT WHEN SETTING THE TIMETABLE FOR STEPS IN THE ARBITRATION.

(VI) UNLESS OTHERWISE AGREED OR SPECIFIED IN THE MEDIATION TERMS, EACH PARTY SHALL BEAR ITS OWN COSTS INCURRED IN THE MEDIATION AND THE PARTIES SHALL SHARE EQUALLY THE MEDIATOR'S COSTS AND EXPENSES.

(VII) THE MEDIATION PROCESS SHALL BE WITHOUT PREJUDICE AND CONFIDENTIAL AND NO INFORMATION OR DOCUMENTS DISCLOSED DURING IT SHALL BE REVEALED TO THE TRIBUNAL EXCEPT TO THE EXTENT THAT THEY ARE DISCLOSABLE UNDER THE LAW AND PROCEDURE GOVERNING THE ARBITRATION.

## CLAUSE "34" - PARAMOUNT CLAUSE GENERAL

THE INTERNATIONAL CONVENTION FOR THE UNIFICATION OF CERTAIN RULES OF LAW RELATING TO BILLS OF LADING SIGNED AT BRUSSELS ON 25 AUGUST 1924 ("THE HAGUE RULES") AS AMENDED BY THE PROTOCOL SIGNED AT BRUSSELS ON 23 FEBRUARY 1968 ("THE HAGUE-VISBY RULES") AND AS ENACTED IN THE COUNTRY OF SHIPMENT SHALL APPLY TO THIS CONTRACT. WHEN THE HAGUE-VISBY RULES ARE NOT ENACTED IN THE COUNTRY OF SHIPMENT, THE CORRESPONDING LEGISLATION OF THE COUNTRY OF DESTINATION SHALL APPLY, IRRESPECTIVE OF WHETHER SUCH LEGISLATION MAY ONLY REGULATE OUTBOUND SHIPMENTS.

WHEN THERE IS NO ENACTMENT OF THE HAGUE-VISBY RULES IN EITHER THE COUNTRY OF SHIPMENT OR IN THE COUNTRY OF DESTINATION, THE HAGUE-VISBY RULES SHALL APPLY TO THIS CONTRACT SAVE WHERE THE HAGUE RULES AS ENACTED IN THE COUNTRY OF SHIPMENT OR IF NO SUCH ENACTMENT IS IN PLACE, THE HAGUE RULES AS ENACTED IN THE COUNTRY OF DESTINATION APPLY COMPULSORILY TO THIS CONTRACT.

THE PROTOCOL SIGNED AT BRUSSELS ON 21 DECEMBER 1979 ("THE SDR PROTOCOL 1979") SHALL APPLY WHERE THE HAGUE-VISBY RULES APPLY, WHETHER MANDATORILY OR BY THIS CONTRACT.

THE CARRIER SHALL IN NO CASE BE RESPONSIBLE FOR LOSS OF OR DAMAGE TO CARGO ARISING PRIOR TO LOADING, AFTER DISCHARGING, OR WHILE THE CARGO IS IN THE CHARGE OF ANOTHER CARRIER, OR WITH RESPECT TO DECK CARGO AND LIVE ANIMALS."

## CLAUSE "35" - BOTH-TO-BLAME COLLISION CLAUSE

IF THE VESSEL COMES INTO COLLISION WITH ANOTHER SHIP AS A RESULT OF THE NEGLIGENCE OF THE OTHER SHIP AND ANY ACT, NEGLECT OR DEFAULT OF THE MASTER, MARINER, PILOT OR THE SERVANTS OF THE CARRIER IN THE NAVIGATION OR IN THE MANAGEMENT OF THE VESSEL, THE OWNERS OF THE CARGO CARRIED HEREUNDER WILL INDEMNIFY THE CARRIER AGAINST ALL LOSS OR LIABILITY TO THE OTHER OR NON- CARRYING SHIP OR HER OWNERS IN SO FAR AS SUCH LOSS OR LIABILITY REPRESENTS LOSS OF, OR DAMAGE TO, OR ANY CLAIM WHATSOEVER OF THE OWNERS OF SAID CARGO, PAID OR PAYABLE BY THE OTHER OR NON-CARRYING SHIP OR HER OWNERS TO THE OWNERS OF SAID CARGO AND SET-OFF, RECOUPED OR RECOVERED BY THE OTHER OR NON-CARRYING SHIP OR HER OWNERS AS PART OF THEIR CLAIM AGAINST THE CARRYING VESSEL OR CARRIER. THE FOREGOING PROVISIONS SHALL ALSO APPLY WHERE THE OWNERS. OPERATORS OR THOSE IN CHARGE OF ANY SHIP OR SHIPS OR OBJECTS OTHER THAN, OR IN

CHARTER PARTY DATED 13TH OF AUGAST 2005 MV "SEABOSS I"

ADDITION TO, THE COLLIDING SHIPS OR OBJECTS ARE AT FAULT IN RESPECT OF A COLLISION OR CONTACT.

## CLAUSE "36" - WAR RISKS ("VOYWAR 1993")

(1)FOR THE PURPOSE OF THIS CLAUSE, THE WORDS:

(A)THE "OWNERS" SHALL INCLUDE THE SHIPOWNERS, BAREBOAT CHARTERERS, DISPONENT OWNERS, MANAGERS OR OTHER OPERATORS WHO ARE CHARGED WITH THE MANAGEMENT OF THE VESSEL, AND THE MASTER; AND

(B)"WAR RISKS" SHALL INCLUDE ANY WAR (WHETHER ACTUAL OR THREATENED), ACT OF WAR, CIVIL WAR, HOSTILITIES, REVOLUTION, REBELLION, CIVIL COMMOTION, WARLIKE OPERATIONS, THE LAYING OF MINES (WHETHER ACTUAL OR REPORTED), ACTS OF PIRACY, ACTS OF TERRORISTS, ACTS OF HOSTILITY OR MALICIOUS DAMAGE, BLOCKADES (WHETHER IMPOSED AGAINST ALL VESSELS OR IMPOSED SELECTIVELY AGAINST VESSELS OF CERTAIN FLAGS OR OWNERSHIP, OR AGAINST CERTAIN CARGOES OR CREWS OR OTHERWISE HOWSOEVER), BY ANY PERSON, BODY, TERRORIST OR POLITICAL GROUP, OR THE GOVERNMENT OF ANY STATE WHATSOEVER, WHICH, IN THE REASONABLE JUDGEMENT OF THE MASTER AND/OR THE OWNERS, MAY BE DANGEROUS OR ARE LIKELY TO BE OR TO BECOME DANGEROUS TO THE VESSEL, HER CARGO, CREW OR OTHER PERSONS ON BOARD THE VESSEL.

(2) IF AT ANY TIME BEFORE THE VESSEL COMMENCES LOADING, IT APPEARS THAT, IN THE REASONABLE JUDGEMENT OF THE MASTER AND/OR THE OWNERS, PERFORMANCE OF THE CONTRACT OF CARRIAGE, OR ANY PART OF IT, MAY EXPOSE, OR IS LIKELY TO EXPOSE, THE VESSEL, HER CARGO, CREW OR OTHER PERSONS ON BOARD THE VESSEL TO WAR  RISKS, THE OWNERS MAY GIVE NOTICE TO THE CHARTERERS CANCELLING THIS CONTRACT OF CARRIAGE, OR MAY REFUSE TO PERFORM SUCH PART OF IT AS MAY  EXPOSE, OR MAY BE LIKELY TO EXPOSE, THE VESSEL, HER CARGO, CREW OR OTHER PERSONS ON BOARD THE VESSEL TO WAR RISKS; PROVIDED ALWAYS THAT IF THIS CONTRACT OF CARRIAGE PROVIDES THAT LOADING OR DISCHARGING IS TO TAKE PLACE WITHIN A RANGE OF PORTS, AND AT THE PORT OR PORTS NOMINATED BY THE CHARTERERS THE VESSEL, HER CARGO, CREW, OR OTHER PERSONS ONBOARD THE VESSEL MAY BE EXPOSED, OR MAY BE LIKELY TO BE EXPOSED, TO WAR RISKS, THE OWNERS SHALL FIRST REQUIRE THE CHARTERERS TO NOMINATE ANY OTHER SAFE PORT WHICH LIES WITHIN THE RANGE FOR LOADING OR DISCHARGING, ANY MAY ONLY CANCEL THIS CONTRACT OF CARRIAGE IF THE CHARTERERS SHALL  NOT HAVE NOMINATED SUCH SAFE PORT OR PORTS WITHIN 48 HOURS OF RECEIPT OF NOTICE OF SUCH REQUIREMENT.

(3)THE OWNERS SHALL NOT BE REQUIRED TO CONTINUE TO LOAD CARGO FOR ANY VOYAGE, OR TO SIGN BILLS OF LADING FOR ANY PORT OR PLACE, OR TO PROCEED OR CONTINUE ON  ANY VOYAGE, OR ANY PART THEREOF, OR TO PROCEED THROUGH ANY CANAL OR WATERWAY, OR TO PROCEED TO OR REMAIN AT ANY PORT OR PLACE WHATSOEVER, WHERE IT APPEARS, EITHER AFTER  THE  LOADING OF THE  CARGO COMMENCES, OR AT ANY STAGE OF THE  VOYAGE THEREAFTER BEFORE THE DISCHARGE OF THE CARGO IS  COMPLETED, THAT, IN THE REASONABLE JUDGEMENT OF THE MASTER AND/OR THE  OWNERS, THE VESSEL, HER CARGO (OR ANY PART THEREOF), CREW OR OTHER PERSONS ON BOARD THE VESSEL (OR ANY ONE OR MORE OF THEM) MAY BE, OR ARE LIKELY TO BE, EXPOSED TO WAR RISKS. IF IT SHOULD SO APPEAR, THE OWNERS MAY BY NOTICE REQUEST THE CHARTERERS TO NOMINATE A SAFE PORT FOR THE DISCHARGE OF THE  ON THE CARGO FOR SUCH EXPENSES AND FREIGHT. CARGO OR ANY PART THEREOF, AND IF WITHIN 48 HOURS OF THE  RECEIPT OF SUCH NOTICE, THE CHARTERERS SHALL NOT HAVE NOMINATED SUCH A PORT, THE OWNERS MAY DISCHARGE THE CARGO AT ANY SAFE PORT OF THEIR CHOICE (INCLUDING THE PORT OF LOADING) IN COMPLETE FULFILLMENT OF THE CONTRACT OF CARRIAGE. THE OWNERS  SHALL BE ENTITLED TO RECOVER FROM THE CHARTERERS THE EXTRA EXPENSES OF SUCH DISCHARGE AND, IF THE DISCHARGE TAKES PLACE AT ANY PORT OTHER THAN THE  LOADING PORT, TO RECEIVE THE FULL FREIGHT AS THOUGH THE CARGO HAD BEEN CARRIED TO THE DISCHARGING PORT AND IF THE EXTRA DISTANCE EXCEEDS 100 MILES,  TO ADDITIONAL  FREIGHT  WHICH  SHALL  BE  THE  SAME  PERCENTAGE  OF  THE  FREIGHT CONTRACTED FOR AS THE PERCENTAGE WHICH THE EXTRA DISTANCE REPRESENTS TO THE DISTANCE OF THE NORMAL AND CUSTOMARY ROUTE, THE OWNERS HAVING A LIEN

(4)IF AT ANY STAGE OF THE VOYAGE AFTER THE LOADING OF THE CARGO COMMENCES, IT APPEARS THAT, IN THE REASONABLE JUDGEMENT OF THE MASTER AND/OR THE OWNERS, THE VESSEL, HER CARGO, CREW OR OTHER PERSONS ON BOARD THE VESSEL  MAY BE, OR ARE LIKELY TO BE, EXPOSED TO WAR RISKS ON ANY PART OF THE ROUTE (INCLUDING ANY CANAL OR WATERWAY) WHICH IS NORMALLY AND CUSTOMARILY USED IN A VOYAGE OF THE NATURE CONTRACTED FOR, AND THERE IS ANOTHER LONGER ROUTE TO THE DISCHARGING PORT, THE OWNERS SHALL GIVE NOTICE TO THE CHARTERERS THAT THIS ROUTE WILL BE TAKEN. IN THIS

CHARTER PARTY DATED 13TH OF AUGAST 2005 MV "SEABOSS I"

EVENT THE OWNERS SHALL BE ENTITLED, IF THE TOTAL EXTRA DISTANCE EXCEEDS 100 MILES, TO ADDITIONAL FREIGHT WHICH SHALL BE THE SAME PERCENTAGE OF THE FREIGHT CONTRACTED FOR AS THE PERCENTAGE WHICH THE EXTRA DISTANCE REPRESENTS TO THE DISTANCE OF THE NORMAL AND CUSTOMARY ROUTE.

(5)THE VESSEL SHALL HAVE LIBERTY:

(A)TO COMPLY WITH ALL ORDERS, DIRECTIONS, RECOMMENDATIONS OR ADVICE AS TO DEPARTURE, ARRIVAL, ROUTES, SAILING IN CONVOY, PORTS OF CALL, STOPPAGES, DESTINATIONS, DISCHARGE OF CARGO, DELIVERY OR IN ANY WAY WHATSOEVER WHICH ARE GIVEN BY THE GOVERNMENT OF THE NATION UNDER WHOSE FLAG THE VESSEL SAILS, OR OTHER GOVERNMENT TO WHOSE LAWS THE OWNERS ARE SUBJECT, OR ANY OTHER GOVERNMENT WHICH SO REQUIRES, OR ANY BODY OR GROUP ACTING WITH THE POWER TO COMPEL COMPLIANCE WITH THEIR ORDERS OR DIRECTIONS;

(B)TO COMPLY WITH THE ORDERS, DIRECTIONS OR RECOMMENDATIONS OF ANY WAR RISKS UNDERWRITERS WHO HAVE THE AUTHORITY TO GIVE THE SAME UNDER THE TERMS OF THE WAR RISKS INSURANCE;

(C)TO COMPLY WITH THE TERMS OF ANY RESOLUTION OF THE SECURITY COUNCIL OF THE UNITED NATIONS, ANY DIRECTIVES OF THE EUROPEAN COMMUNITY, THE EFFECTIVE ORDERS OF ANY OTHER SUPRANATIONAL BODY WHICH HAS THE RIGHT TO ISSUE AND GIVE THE SAME, AND WITH NATIONAL LAWS AIMED AT ENFORCING THE SAME TO WHICH THE OWNERS ARE SUBJECT, AND TO OBEY THE ORDERS AND DIRECTIONS OF THOSE WHO ARE CHARGED WITH THEIR ENFORCEMENT;

(D)TO DISCHARGE AT ANY OTHER PORT ANY CARGO OR PART THEREOF WHICH MAY RENDER THE VESSEL LIABLE TO CONFISCATION AS A CONTRABAND CARRIER;

(E)TO CALL AT ANY OTHER PORT TO CHANGE THE CREW OR ANY PART THEREOF OR OTHER PERSONS ON BOARD THE VESSEL WHEN THERE IS REASON TO BELIEVE THAT THEY MAY BE SUBJECT TO INTERNMENT, IMPRISONMENT OR OTHER SANCTIONS;

(F)WHERE CARGO HAS NOT BEEN LOADED OR HAS BEEN DISCHARGED BY THE OWNERS UNDER ANY PROVISIONS OF THIS CLAUSE, TO LOAD OTHER CARGO FOR THE OWNERS' OWN BENEFIT AND CARRY IT TO ANY OTHER PORT OR PORTS WHATSOEVER, WHETHER BACKWARDS OR FORWARDS OR IN A CONTRARY DIRECTION TO THE ORDINARY OR CUSTOMARY ROUTE.

(6)IF IN COMPLIANCE WITH ANY OF THE PROVISIONS OF SUB-CLAUSES (2) TO (5) OF THIS CLAUSE ANYTHING IS DONE OR NOT DONE, SUCH SHALL NOT BE DEEMED TO BE A DEVIATION, BUT SHALL BE CONSIDERED AS DUE FULFILLMENT OF THE CONTRACT OF CARRIAGE.

**CLAUSE "37" - ISPS CLAUSE FOR VOYAGE CHARTER PARTIES**

(A) (I) FROM THE DATE OF COMING INTO FORCE OF THE INTERNATIONAL CODE FOR THE SECURITY OF SHIPS AND OF PORT FACILITIES AND THE RELEVANT AMENDMENTS TO CHAPTER XI OF SOLAS (ISPS CODE) IN RELATION TO THE VESSEL, THE OWNERS SHALL PROCURE THAT BOTH THE VESSEL AND "THE COMPANY" (AS DEFINED BY THE ISPS CODE) SHALL COMPLY WITH THE REQUIREMENTS OF THE ISPS CODE RELATING TO THE VESSEL AND "THE COMPANY". UPON REQUEST THE OWNERS SHALL PROVIDE A COPY OF THE RELEVANT INTERNATIONAL SHIP SECURITY CERTIFICATE (OR THE INTERIM INTERNATIONAL SHIP SECURITY CERTIFICATE) TO THE CHARTERERS. THE OWNERS SHALL PROVIDE THE CHARTERERS WITH THE FULL STYLE CONTACT DETAILS OF THE COMPANY SECURITY OFFICER (CSO).

(II) EXCEPT AS OTHERWISE PROVIDED IN THIS CHARTER PARTY, LOSS, DAMAGE, EXPENSE OR DELAY, EXCLUDING CONSEQUENTIAL LOSS, CAUSED BY FAILURE ON THE PART OF THE OWNERS OR "THE COMPANY" TO COMPLY WITH THE REQUIREMENTS OF THE ISPS CODE OR THIS CLAUSE SHALL BE FOR THE OWNERS' ACCOUNT.

(B) (I) THE CHARTERERS SHALL PROVIDE THE CSO AND THE SHIP SECURITY OFFICER (SSO)/MASTER WITH THEIR FULL STYLE CONTACT DETAILS AND ANY OTHER INFORMATION THE OWNERS REQUIRE TO COMPLY WITH THE ISPS CODE.

(II) EXCEPT AS OTHERWISE PROVIDED IN THIS CHARTER PARTY, LOSS, DAMAGE, EXPENSE, EXCLUDING CONSEQUENTIAL LOSS, CAUSED BY FAILURE ON THE PART OF THE CHARTERERS TO COMPLY WITH THIS CLAUSE SHALL BE FOR THE CHARTERERS' ACCOUNT AND ANY DELAY CAUSED BY SUCH FAILURE SHALL BE COMPENSATED AT THE DEMURRAGE RATE.

CHARTER PARTY DATED 13TH OF AUGAST 2005 MV "SEABOSS I"

PAGE 11 OF 11

(C) PROVIDED THAT THE DELAY IS NOT CAUSED BY THE OWNERS' FAILURE TO COMPLY WITH THEIR OBLIGATIONS UNDER THE ISPS CODE, THE FOLLOWING SHALL APPLY:

(I) NOTWITHSTANDING ANYTHING TO THE CONTRARY PROVIDED IN THIS CHARTER PARTY, THE VESSEL SHALL BE ENTITLED TO TENDER NOTICE OF READINESS EVEN IF NOT CLEARED DUE TO APPLICABLE SECURITY REGULATIONS OR MEASURES IMPOSED BY A PORT FACILITY OR ANY RELEVANT AUTHORITY UNDER THE ISPS CODE.

(II) ANY DELAY RESULTING FROM MEASURES IMPOSED BY A PORT FACILITY OR BY ANY RELEVANT AUTHORITY UNDER THE ISPS CODE SHALL COUNT AS LAYTIME OR TIME ON DEMURRAGE IF THE VESSEL IS ON LAYTIME OR DEMURRAGE. IF THE DELAY OCCURS BEFORE LAYTIME HAS STARTED OR AFTER LAYTIME OR TIME ON DEMURRAGE HAS CEASED TO COUNT, IT SHALL BE COMPENSATED BY THE CHARTERERS AT THE DEMURRAGE RATE.

(D) NOTWITHSTANDING ANYTHING TO THE CONTRARY PROVIDED IN THIS CHARTER PARTY, ANY ADDITIONAL COSTS OR EXPENSES WHATSOEVER SOLELY ARISING OUT OF OR RELATED TO SECURITY REGULATIONS OR MEASURES REQUIRED BY THE PORT FACILITY OR ANY RELEVANT AUTHORITY IN ACCORDANCE WITH THE ISPS CODE INCLUDING, BUT NOT LIMITED TO, SECURITY GUARDS, LAUNCH SERVICES, TUG ESCORTS, PORT SECURITY FEES OR TAXES AND INSPECTIONS, SHALL BE FOR THE CHARTERERS' ACCOUNT, UNLESS SUCH COSTS OR EXPENSES RESULT SOLELY FROM THE OWNERS' NEGLIGENCE. ALL MEASURES REQUIRED BY THE OWNERS TO COMPLY WITH THE SHIP SECURITY PLAN SHALL BE FOR THE OWNERS' ACCOUNT.

(E) IF EITHER PARTY MAKES ANY PAYMENT WHICH IS FOR THE OTHER PARTY'S ACCOUNT ACCORDING TO THIS CLAUSE, THE OTHER PARTY SHALL INDEMNIFY THE PAYING PARTY

CLAUSE "38". NEW JASON CLAUSE
IN THE EVENT OF ACCIDENT, DANGER, DAMAGE OR DISASTER BEFORE OR AFTER THE COMMENCEMENT OF THE VOYAGE, RESULTING FROM ANY CAUSE WHATSOEVER, WHETHER DUE TO NEGLIGENCE OR NOT, FOR WHICH, OR FOR THE CONSEQUENCE OF WHICH, THE CARRIER IS NOT RESPONSIBLE, BY STATUTE, CONTRACT OR OTHERWISE, THE GOODS, SHIPPERS, CONSIGNEES OR OWNERS OF THE GOODS SHALL CONTRIBUTE WITH THE CARRIER IN GENERAL AVERAGE TO THE PAYMENT OF ANY SACRIFICES, LOSSES OR EXPENSES OF A GENERAL AVERAGE NATURE THAT MAY BE MADE OR INCURRED AND SHALL PAY SALVAGE AND SPECIAL CHARGES INCURRED IN RESPECT OF THE GOODS.

IF A SALVING SHIP IS OWNED OR OPERATED BY THE CARRIER, SALVAGE SHALL BE PAID FOR AS FULLY AS IF THE SAID SALVING SHIP OR SHIPS BELONGED TO STRANGERS. SUCH DEPOSIT AS THE CARRIER OR HIS AGENTS MAY DEEM SUFFICIENT TO COVER THE ESTIMATED CONTRIBUTION OF THE GOODS AND ANY SALVAGE AND SPECIAL CHARGES THEREON SHALL, IF REQUIRED, BE MADE BY THE GOODS, SHIPPERS, CONSIGNEES OR OWNERS OF THE GOODS TO THE CARRIER BEFORE

# EXHIBIT E

COPY

IN THE MATTER OF THE ARBITRATION ACT 1996

AND

IN THE MATTER OF AN ARBITRATION

**B E T W E E N :-**

CROSSBOW CEMENT SA of Geneva, Switzerland

Claimants
(Sellers)

-  and –

MOHAMED ALI SALEH AL-HASHEDI & BRO. of Taiz, Yemen Republic

Respondents
(Buyers)

"SEABOSS 1"

Sale Contract dated on or about 27th July 2005

FINAL ARBITRATION AWARD

**W H E R E A S :-**

1.  By a sale contract contained in and evidenced by a pro-forma invoice number 07091/05 dated Geneva July 27th, 2005, the Claimants (hereinafter referred to as "the Sellers") agreed to sell and the Respondents (hereinafter referred to as "the Buyers") agreed to buy about 25,000 metric tons of Chinese bagged Portland cement at a unit price based on free out discharge at Aden. The pro-forma invoice was countersigned by the Buyers on 30th July 2005 and, according to the

- 2 -

transmission report at the top of the page, was faxed back by the Buyers to the Sellers on that date.

2.  The contract provided that it was to be governed by English law and any disputes were to be referred to arbitration in London in accordance with the Gencon charterparty terms.

3.  Disputes arose between the parties as detailed hereafter. The Sellers appointed me, Mark William Hamsher of 18c Ensign Street, London E1 8JD, as the arbitrator nominated by them on 2nd May 2006. On the same date their Paris solicitors, Messrs. Penlaw, gave the Buyers notice by fax of my appointment and called upon them to appoint their arbitrator within 14 days. In a fax of 9th June they called upon the Buyers to appoint their arbitrator within 7 days of that date, failing which I would be appointed as sole arbitrator in the reference. The notices complied with s.16 and s.17 of the Arbitration Act 1996. The Buyers failed to appoint an arbitrator of their own. Messrs. Penlaw asked me to accept appointment as the sole arbitrator under the Arbitration Act 1996. I asked to see copies of the notices sent to the Buyers. Having reviewed the notices and the transmission reports which showed that they had been correctly sent, on 8th August 2006 I accepted appointment as sole arbitrator in respect of disputes that had arisen under the sale contract in accordance with the Arbitration Act 1996. No objections to my acting as sole arbitrator were raised by the Buyers at the time or indeed at any time prior to the publication of this final award. The seat of the arbitration is in London.

- 3 -

4.  The Sellers claimed demurrage of US$91,140 together with interest as well as the costs of Messrs. Penlaw in the amount of €5,600.

5.  Submissions in support of the Sellers' claims together with supporting documentation were served by Messrs. Penlaw on the Buyers by fax on 2nd May 2006 when they also gave them notice of my appointment on 2nd May 2006.

6.  On 17th August I sent the following fax to the Buyers, marked for the attention of Mr. Ibrahim Al Hashedi, who was described in one of the contemporaneous documents as the Buyers' general manager and who had telephoned me at an earlier date when I had been unable to talk at any length:-

> "I refer to my fax of 8th August and the subsequent fax of 9th August from Penlaw.
>
> When you telephoned me to ask about the effect of my fax of 8th August, I am afraid that I must have written down your telephone number incorrectly because when I tried to call you back I did not obtain a ringing tone.
>
> The situation is straightforward. The fax of 2nd May sent to you by Penlaw together with the enclosures constitute the claim submissions of Crossbow Cement SA. Penlaw of Paris are pursuing the claim on behalf of Crossbow Cement SA.

- 4 -

As confirmed in my fax of 8th August, I am now the sole arbitrator in respect of the disputes that have arisen under the contract. It goes without saying that, although initially I was appointed by only one party, I shall, of course, throughout the reference act with the same impartiality as if I had initially been appointed as sole arbitrator by both parties.

If you wish to defend the claim, it is necessary for you to serve submissions of defence. Defence submissions can be set out informally in a letter or a fax and there is no need for you to instruct lawyers. Bearing in mind the time that has elapsed since details of the claim were served on you on 2nd May, the suggested time limit of 14 days for service of defence submissions seems to me to be realistic. However, I confirm that in the event of your encountering real difficulties in complying with it, there is liberty to apply for an extension of it.

In order to provide a proper timetable for the reference, I therefore order that defence submissions be served on or by close of business in London on 29th August. In the event of neither defence submissions nor a request for an extension being received by that time limit, I shall, on the application of the claimants, feel free to make a final and peremptory order for service of defence submissions with a short time limit, on expiry of which I would proceed to my award on the basis of the documents then before me.

- 5 -

Naturally I hope that it will not come to that and that you will serve defence submissions.

Please do not hesitate to contact me if at any stage you require guidance on the procedure followed in London arbitration."

7.    I subsequently received a number of telephone calls from Mr. Ibrahim Al Hashedi in which he alleged in the most general and unparticularised terms that the Sellers were dishonest. I repeatedly explained to him that I could not take account of any allegations made in a telephone conversation to which the Sellers were not a party but that I would, of course, take into account any allegations that were put into writing and copied to the lawyers acting for the claimant Sellers. He subsequently faxed to me without a covering fax sheet a copy of a Crossbow Cement S.A. invoice number 09018/05 dated 26th September 2005 which will be considered in greater detail below.

8.    On 29th August I sent a fax to the Buyers, marked for the attention of Mr. Ibrahim Al Hashedi, in the following terms:-

"I refer to our recent telephone conversation when I urged you to serve defence submissions.

23/05/2008 11:52 004122-7856979 CROSSBOW PAGE 06/18
Case 1:08-cv-05074-HB Document 16-6 Filed 07/23/2008 Page 7 of 19
Fax sent by : 82877822528 MARK HAMSHER 12-12-06 18:18 Pg: 7/23

- 6 -

You subsequently faxed to me a copy of Crossbow Cement SA's invoice number 09016/05 dated 26 September 2005. Unfortunately, there were no submissions or any other documents.

I can, of course, properly proceed to my award only with the benefit of documentation from one party. However, you commented that the claim was not a proper one. I would urge you to explain in writing why you consider that to be the case. If you do intend to serve any further documents or submissions, can you please ensure that they are served by no later than close of business in London on Thursday 7 September. If I do not hear from you by that date, I shall assume that you are content that I should proceed to my award on the basis of the documents then before me and I shall do so without any further notice to you."

9. In a subsequent telephone conversation Mr. Ibrahim Al Hashedi repeated in categoric terms that the Buyers were not intending to file any defence submissions.

10. After reviewing the papers with a view to proceeding to my award, in a fax of 26th September 2006 I advised Messrs. Penlaw of an apparent contradiction between the copy of the Crossbow Cement invoice number 09016/05 dated 26th September 2005 sent to me by Mr. Ibrahim Al Hashedi and the invoice number 09002A/05 dated 25th October 2005 on the basis of which, inter alia, the claim was advanced. The contradictions will be considered in greater detail below. However, in a fax

- 7 -

of 28th September Messrs. Penlaw explained in detail why it was their clients'
case that the document sent to me by Mr. Ibrahim Al Hashedi was a forgery, being
an alteration of an original invoice submitted by the Sellers.

11. On 29th September 2006 I sent the following fax to the Buyers, marked for the
attention of Mr. Ibrahim Al Hashedi:-

> "I refer to your copy of the fax of 28th September and the enclosures
> from Penlaw.
>
> You have previously stated categorically that you do not intend to
> serve any defence submissions. However, particularly bearing in
> mind the doubts raised by Penlaw and their clients about the
> authenticity of the documents submitted by you, it is obviously
> appropriate that you should be given an opportunity to serve
> submissions in response to that fax.
>
> If you wish to serve any comments/submissions, can you please
> ensure that they are received by close of business in London on
> Monday 9th October. If I do not hear from you within that time
> limit, I shall assume that you do not intend to serve any submissions
> and are content that I should proceed to an award on the basis of the
> documents now before me.

23/05/2008 11:52 004122-7866979 CROSSBOW PAGE 08/18
Case 1:08-cv-05074-HB Document 16-6 Filed 07/23/2008 Page 9 of 19
Fax sent by : 0207782252a MARK HAMSHER 12-12-06 18:18 Pg: 9/23

- 8 -

Naturally I very much hope that you will serve defence submissions."

12. Mr. Ibrahim Al Hashedi subsequently telephoned me on several further occasions, emphasising that the Sellers were dishonest and were deceiving me, without giving any details. When I repeated my earlier position that he had to serve defence submissions, he maintained his position that he was not going to serve any defence submissions but repeated that I would be misled unless I received original documentation from the Sellers. I pointed out both in our telephone conversations and, for instance, in a fax of 19th October, that whereas no challenge had been made to the authenticity of any of the documents relied upon by the Sellers, Messrs. Penlaw, on behalf of the Sellers, had advanced a detailed challenge to the authenticity of the invoice dated 26th September number 09160/05 that he had faxed to me. In accordance with his suggestion that I should see original documentation, I asked him to send to me the original of that invoice so that I could assess its authenticity. He faxed back my fax of 19th October with the endorsement:-

"OKY [sic], I SHALL SEND VIA DHL".

A copy of that fax is attached to this award as Appendix I.

13. On 1st November 2006 I sent the following fax to Messrs. Penlaw, with a copy to the Buyers:-

- 9 -

"I refer to your copy of my fax of 19 October addressed to Mohamed Ali Saleh Al-Hashedi & Bro.

I attach a copy of my fax which was returned to me by them on 28 October confirming that the original would be sent to me by DHL.

They have asked that you be required to send original documentation to me. As I pointed out in my fax of 19 October, the authenticity of the invoice dated 27 July 2005 number 07091/05 has not actually been challenged since no defence submissions have been served. However, since there does appear to be an issue as to the authenticity of documentation, I would be very grateful if you could forward to me the originals of the documents upon which your clients rely and I shall then be in a position to proceed to my award with the benefit of a review of the original documentation without any further delay."


14.    Under cover of a letter of 15th November 2006 Messrs. Penlaw sent to me the actual faxes of 27th July and 26th September 2005 that had been countersigned and faxed back by Mr. Ibrahim Al Hashedi that had previously been sent to me in copy. Their covering letter was faxed to Mr. Ibrahim Al Hashedi of the Buyers. I reminded him, both in a fax of 13th November and in further telephone conversations that I had not yet received the original invoice upon which he relied, despite the fact that its authenticity had expressly been put in issue.

Case 1:08-cv-05074-HB

- 10 -

15.      On 14th November I sent the following fax to the Buyers for the attention of Mr. Ibrahim Al Hashedi:-

"I refer to your copy of the fax of 14th November from Penlaw.

The original invoice that you were going to send to me has certainly not reached me. Could you please ensure that I receive it by no later than close of business in London on Tuesday 21st November. If I do not receive it by that date, I shall proceed to my award on the basis of the documents then before me to the exclusion of any documents served after that time limit. I confirm that the time limit is laid down in final and peremptory terms. Naturally I very much hope that you will send to me the original invoice as promised so that I can consider it in the context of the dispute as to its validity."

16.      In a fax of 16th November I again urged the Buyers to send me the original invoice that they had previously said that they would be sending. Unfortunately, the Buyers chose neither to serve defence submissions nor to send the original invoice which they had faxed to me as an apparent defence. I was, however, satisfied that they had been given every reasonable opportunity of serving defence submissions and/or asking for an oral attended hearing and that it was proper that I should proceed to my award even in the absence of such submissions or such a request.

17.      It was not appropriate for me to attach any weight to the allegations of dishonesty made in repeated telephone calls by Mr. Ibrahim Al Hashedi on behalf of the

Fax sent by : 82077622528        MARK HAMSHER        12-12-06 18:18    Pg: 12/23

- 11 -

Buyers for two reasons. First of all, he never provided any particulars of how that dishonesty was supposed to affect the Sellers' claims, particularly bearing in mind, as I pointed out to him, that there was no suggestion that the cement had not actually been supplied to the Buyers. Secondly, despite my explaining in the clearest possible terms that I could not take account of any allegations that were not put in writing so that the Sellers had an opportunity of answering them, he never served any defence submissions.

18.    However, despite the absence of a particularised challenge to the authenticity of the documentation adduced in support of the Sellers' claims, I considered it appropriate to scrutinise with particular care the documentation submitted by the Sellers and the invoice faxed to me, albeit without any covering submissions, by the Buyers.

19.    The Sellers' claim was put forward in straightforward terms. They relied on the terms of the contract to be found in the pro-forma invoice number 07091/05 dated 27th July 2005. A copy of that invoice showing that it had been faxed back by MASH & Bro on 30th July is attached as Appendix II to this award. It shows clearly the signature of "Ibrahim". It also has on it the stamp of the Buyers and Mr. Ibrahim Al Hashedi's distinctive way of signing and dating documents, with the year at the top, the month under that, the day at the bottom, with all the numbers in a series of circles.    Mr. Ibrahim Al Hashedi had signed and dated a number of documents that were adduced in evidence in that distinctive way.

- 12 -

20.   As has already been pointed out, the authenticity of the contract to be found in pro-forma invoice number 07091/05 was not challenged. I was satisfied that it correctly recorded the terms of the agreement between the parties and in particular that the agreed discharging rate was 1,500 metric tons per weather working day, Fridays and holidays excepted unless used and the daily demurrage rate was US$20,000.

21.   The original contract provided for discharge in Aden. At the request of the Buyers, the Sellers agreed to the cargo being discharged at Berbera and Hodeidah. 5,000 tonnes was discharged by the "SEABOSS 1" at Berbera with the balance of the cargo being discharged at Hodeidah.

22.   In exchange for this agreement by the Buyers, the Sellers were to pay a lump sum of US$75,000. A copy of the invoice that was countersigned and faxed back by Mr. Ibrahim Al Hashedi on behalf of the Buyers is attached to these reasons as Appendix III.

23.   According to the Sellers' laytime calculations, which relied on the statement of facts for Berbera, time started counting at 1300 hours on Saturday 1st October 2005. Laytime expired at 2100 hours on Tuesday 4th October and the vessel remained on demurrage until discharge was completed at 0500 hours on 9th October. The Sellers calculated that the vessel was on demurrage for 4.5 days which, at the agreed demurrage rate of US$20,000 per day, gave rise to a demurrage claim of US$90,000.

24. They also claimed demurrage of US$1,140 in respect of a vessel called the "SAPANCA. The supporting documentation was not adduced in evidence because the Sellers relied upon a fax of 26[th] October 2005 from Mr. Ibrahim Al Hashedi on behalf of the Buyers confirming that the demurrage due to the Sellers was US$1,140. If, as seemed likely, the acknowledged debt arose under another transaction, no objection was raised to it being claimed in these arbitration proceedings and I therefore had jurisdiction in respect of it. The Sellers therefore claimed total demurrage of US$91,140 together with interest and costs.

25. Finally, a copy of the invoice that Mr. Ibrahim Al Hashedi relied upon that he faxed to me is attached as Appendix IV. However, as has already been explained, it is noteworthy that, despite confirming that he would do so, he never sent the original invoice.

26. The invoice that Mr. Ibrahim Al Hashedi faxed to me would, if it correctly recorded the agreement of the parties, reduce considerably the Sellers' entitlement to demurrage. The discharging rate was reduced from 1,500 to 1,000 tonnes per weather working day; Fridays and holidays were not to count, even if used; the demurrage rate was reduced from US$20,000 per day to US$10,000 per day.

27. In their submissions of 28th September, Messrs. Penlaw, on behalf of the Sellers, served detailed submissions explaining why it was their case that the invoice faxed to me by Mr. Ibrahim Al Hashedi was a forgery. Firstly, they pointed out that the differences between the two invoices were written by a different typewriter or printer from that used for the original invoice. Secondly, they

- 14 -

adduced in evidence the complete exchange between the parties under which the
parties had agreed an increase in the price by US$45,000 for discharge at Berbera
and US$30,000 for discharge at Hodeidah (a total of US$75,000) with no
reference anywhere to any change in the agreed discharge rate or demurrage rate.
Furthermore, they adduced in evidence a message dated 27th October from
Mr. Mohamed A.S. Al-Hashedi, the Chairman of the Buyers' Board of Directors,
in which he indicated that he wished to negotiate the demurrage claim but never
suggested that a different demurrage and discharging rate had been agreed.  An
earlier message of 25th October from Mr. Ibrahim Al Hashedi had also raised no
objections to the calculation of the demurrage claim.

28.     It is worth setting out in full the submissions made by Messrs. Penlaw identifying
the changes made to the original invoice, particularly bearing in mind that those
submissions were never contradicted by Mr. Ibrahim Al Hashedi and he never
submitted the original invoice upon which he relied, despite having said that he
would do so.  The points made by Messrs. Penlaw in their submissions of 28th
September 2006 were as follows:-

1.  The original invoice (which provided for discharge at 1,500 tonnes per wwd
and demurrage at US 20,000) was returned to the Sellers with the Letter of
Credit number handwritten in the heading.  That had been deleted and the LC
number added apparently with a typewriter different to that used originally.
The LC number was slightly out of line and the letters "L/C NO" appeared to
be larger.

23/05/2008 11:52 004122-7866979 CROSSBOW PAGE 15/18
Fax sent by : 02077022528 MARK HAMSHER 12-12-98 10:11
Case 1:08-cv-05074-HB Document 16-6 Filed 07/23/2008 Page 16 of 19

- 15 -

2. The discharging rates had been changed. This was apparent from a number of factors:

(i) a comparison of the thickness in the zeros in line 7 where the discharging rate had been changed from 1 500 to 1000 tonnes. The zeros in this line should be compared to those appearing in line 9 for the demurrage rate. In that case the zeros did not have to be changed only the 2 had to be changed to "1";

(ii) the number 1 on the machine used for the altered invoice was different to that originally used - compare the 1s in lines 7, 9, 13 and 15 to those appearing in the bank instructions at the bottom of the document. The 1s in lines 7, 9, 13 and 15, where they have been changed; they have a very strong upper bar, whereas in the bank instructions the line is almost straight vertical, with an almost non-existent upper bar. The 1s appearing in line 7 and 14 of the original invoice (containing the demurrage rate of USD 20 000 per day) are entirely consistent with those appearing in the payment instructions at the bottom of the document.

3. Again, the Buyers added the final 3 lines starting "this pro-forma invoice" using a different typing machine with stronger print.

4. Number 5 appearing in the original invoice has a vertical stroke between the lower loop and the upper line however that appearing from use of the new machine (that was used to add the words in the heading "LC NO E500385"

x sent by : 02077022520   MARK HANSHER

- 16 -

and used for the final 3 lines), is different. The line before the lower loop and the upper horizontal stroke is angled to the right.

29.   I was also satisfied that the exchanges between the parties showed a complete variation of the agreement between the parties in terms of agreed extra freight for the change of discharge ports, but no variation of the discharging and demurrage rates.

30.   I had little hesitation in concluding that the Sellers had established the authenticity of the documentation upon which they relied. In turn, the totality of the evidence persuaded me that the faxed invoice sent to me by Mr. Ibrahim Al Hashedi had to be rejected; it was not an authentic document and it did not accurately record either the original agreement between the parties or an amendment of it.

31.   The claim of the Sellers therefore succeeded in full. Since the demurrage was payable every 3 days in advance, it was appropriate to award interest from the date of the Sellers' invoice, namely 25th October 2005. Since they had been entirely successful, they were entitled to recover their costs. The costs of Messrs. Penlaw were claimed at the charging rate of €350.00 per hour. That charging rate is at least in line with and indeed lower than the rates charged by most firms of solicitors in the City of London specialising in commercial maritime litigation. It would always have been open to the Sellers to instruct London solicitors. I was therefore satisfied that the lower rate charged by Messrs. Penlaw in Paris was properly recoverable. Their total claim for 16 hours accurately reflected the work

- 17 -

that, it was obvious from my file, they had had to carry out. The claim for costs of €5,600 therefore succeeded in full.

32.    Since they had been successful, the Sellers were also entitled to recover the costs of my award.

33.    NOW I, the said Mark William Hamsher, having taken upon myself the burden of this reference, having considered the written evidence and arguments submitted to me, DO HEREBY MAKE, ISSUE AND PUBLISH this my FINAL AWARD as follows:-

A)    I FIND that the Sellers' claim for US$91,140 succeeds in full.

B)    I THEREFORE AWARD AND ADJUDGE that the Buyers shall forthwith pay to the Sellers US$91,140 (ninety-one thousand, one hundred and forty dollars) together with compound interest thereon at the rate of 8% per annum compounded at 3 monthly rests from 25th October 2005 until the date of payment.

C)    I FURTHER AWARD AND ADJUDGE that the Buyers shall bear their own and the Owners' costs of the reference which I hereby assess in the amount of €5,600.

D)    I FURTHER AWARD AND ADJUDGE that the Buyers shall bear the costs of this my final award in the amount of £4,500 PROVIDED that if, in the first instance, the Sellers shall have borne any part of the said costs of this my final

x sent by : 02077822528          MARK HAMSHER

- 18 -

award, they shall be entitled to immediate reimbursement by the Buyers of the

sum so paid.

E)      I FURTHER AWARD AND ADJUDGE that the Sellers shall be entitled to

compound interest at the rate of 8% per annum compounded at 3 monthly rests on

the costs awarded to them in paragraph C above and on any sums payable to them

under paragraph D above from the date of this award until the date of payment or

reimbursement.

GIVEN under my hand in London this        6th        day of December 2006

.....Mark Hamsher.....                    .....Alan McKay.....

Sole Arbitrator                           Witness