```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
                                                                  :
CROSSBOW CEMENT SA,                                               :
                                                                  :
                              Plaintiff,                          :
                                                                  :        08 Civ. 5074 (HB)
                  - against -                                     :
                                                                  :        OPINION & ORDER
MOHAMED ALI SALEH AL-HASHEDI &                                    :
BROTHERS,                                                         :
                                                                  :
                              Defendant.                          :
                                                                  :
------------------------------------------------------------------x
```

**Hon. HAROLD BAER, JR., District Judge:**

Plaintiff Crossbow Cement SA obtained an Ex Parte Order for Process of Maritime Attachment ("Attachment Order") with respect to its claim for demurrage pursuant to a sales contract between it and Defendant Mohamed Ali Saleh Al-Hashedi & Brothers. As of August 4, 2008, Plaintiff had attached $134,110 of Defendant's funds, the full amount set forth in the Attachment Order. Defendant moves to vacate the Attachment Order and release its funds on the ground that Plaintiff's claim is not "maritime" in nature. For the reasons set forth below, the Attachment Order will remain in place and Defendant's motion is denied.

### I. BACKGROUND

Plaintiff, a foreign corporation organized under Swiss law, sold a cargo of approximately 25,000 metric tons of cement to Defendant, a foreign corporation organized under Yemeni law, pursuant to a sales contract dated July 27, 2005 ("Sales Contract"). (Compl. ¶¶ 2-4.) The Sales Contract, which bears the title "Pro Forma Invoice No. 07091/05," provides that the shipment was to be made by sea to the port of Aden, Yemen, and specifies how the cement was to be packed, the quantity sold, the unit price, the time of shipment and how payment was to be made. (*See* Jacobson Decl. Ex. 1.)

The Sales Contract refers to a provision contained in a standard form charter party, the Uniform General Charter published by the Baltic and International Maritime Conference, as revised in 1922 and 1976 ("Gencon Charter Party"). (*See* Decl. of Rahul Wanchoo Ex. D.) Specifically, the Sales Contract provides that the discharge rate was "as per 'Gencon' C/P [*i.e.*, Charter Party] terms." (Jacobson Decl. Ex. 1.) The Sales Contract identifies English law as the

1

governing law and further states, simply, "London arbitration clause."

Finally, the Sales Contract contains a demurrage clause as follows: "Demurrages: US$20,000 per day or prorata, payable every 3 days in advance." (*Id.*) Demurrage is defined under maritime law as a liquidated penalty owed by a charterer to a shipowner for the charterer's failure to load or unload cargo by a certain time. *See* Black's Law Dictionary (7th ed.).

Slightly more than two weeks after the parties executed the Sales Contract, Plaintiff entered into a charter party on the standard Gencon Charter Party form with the owner of the M/V SEABOSS 1, Seafreighters Line Inc. of Panama, which is not a party to this action or to the Sales Contract. (Decl. of Rahul Wanchoo Ex. D.) The charter party, dated August 13, 2005, provides that the M/V SEABOSS 1 would carry Plaintiff's cement from Longkou, China to Aden, Yemen, and sets demurrage at the same rate as the Sales Contract, $20,000 per day. (*Id.* at 1.) Finally, the charter party identifies English law as the governing law and provides that any dispute arising out of or in connection with the charter party must be arbitrated in London in accordance with the London Maritime Arbitrators Association. (*Id.* at 7.)

On September 26, 2005, Plaintiff and Defendant amended their Sales Contract on a form titled "Invoice No. 09016/05" ("Amendment"), which provides that the cement would be discharged in part at Berbera, Somalia and in part at Hodeiah, Yemen, instead of Aden, in exchange for an additional lump sum payment by Plaintiff. (Jacobson Decl. Ex. 2.) Like the original Sales Contract, the Amendment refers to terms in the Gencon Charter Party, and it recognizes that the M/V SEABOSS 1 would carry the cement. The Amendment contains the same demurrage provision as the Sales Contract and charter party. (*Id.*)

Plaintiff alleges that it incurred demurrage on the vessel at Berbera, Somalia for 4.5 days at $20,000 per day, or a total of $90,000, pursuant to the Sales Contract and Amendment. (Compl. ¶ 6.) Plaintiff commenced arbitration against Defendant in London pursuant to the arbitration clause in the Sales Contract and designated an arbitrator, Mark William Hamsher ("Arbitrator") of the London Maritime Arbitrators Association. (Wanchoo Decl. Ex. E.) Plaintiff and the Arbitrator each sent notices of the arbitration and requests for defense submissions to Defendant, but Defendant never submitted a written defense in the arbitration, requested a hearing, objected to the designation of the Arbitrator or attempted to appoint its own arbitrator. (*Id.* at 1-4.) In several telephone calls to the Arbitrator, a representative of Defendant asserted generally that Plaintiff's allegations were false but refused to make any written submissions. (*Id.* at 5-6.) Ultimately, on December 6, 2006, the Arbitrator rendered a Final

Arbitration Award on the basis of the evidence submitted by Plaintiff.

The Arbitrator found that Defendant owed Plaintiff demurrage in the amount of $90,000 under the Sales Contract and Amendment, as payment for the detention of the M/V SEABOSS 1 at Berbera, Somalia for 4.5 days.  The Arbitrator also awarded Plaintiff demurrage in the amount of $1,140 with respect to the detention of a separate vessel called the "SAPANCA."  (*Id.* at 13.)  As to the detention of the SAPANCA, the Arbitrator relied on a facsimile sent from Defendant to Plaintiff on October 26, 2005, in which Defendant confirmed that it owed Plaintiff demurrage in the amount of $1,140.  (*Id.*)  The Arbitrator explained that "[i]f, as seemed likely, the acknowledged debt arose under another transaction, no objection was raised to it being claimed in these arbitration proceedings and I therefore had jurisdiction in respect of it."[1]  (*Id.*)  The Arbitrator therefore awarded Plaintiff total demurrage in the amount of $91,140, plus interest and costs.  (*Id.* at 17.)  The total award, including interest, as of May 29, 2008 was $134,110, which is also the amount of the maritime attachment obtained by Plaintiff here.  (Compl. ¶ 8.)

Plaintiff alleges that Defendant has failed to pay any amount of the arbitration award.  (*Id.* ¶ 9.)  Defendant has not appealed from or otherwise moved to set aside the Final Arbitration Award, and its time for doing so has passed.  (*Id.* ¶ 10.)

## II.  LEGAL STANDARD

With respect to an *in personam* action based on an admiralty claim, Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims ("Supplemental Rules") of the Federal Rules of Civil Procedure permits a plaintiff to obtain from a district court, *ex parte*, an order that directs financial institutions within the district to attach the defendant's property, up to the amount sued for.  Fed. R. Civ. P. Supp. Rule B(1).  To obtain such an order, the plaintiff must submit a verified complaint, and the plaintiff or the plaintiff's attorney must sign and file an affidavit stating that, to the affiant's knowledge, or on information and belief, the defendant cannot be found within the district.  *Id.*  "If the plaintiff's filings comply with these conditions, the court must enter an order authorizing the attachment, which the plaintiff may then serve on any persons in possession of the defendant's property located within the district."  *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 438 (2d Cir. 2006).

Once its property has been restrained, the defendant may appear before the district court to contest the attachment pursuant to Supplemental Rule E(4)(f), which provides in relevant part:

---

[1] In this case, Defendant has not made any separate objection to the demurrage award relating to the SAPANCA.

> Whenever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules.

Fed. R. Civ. P. Supp. Rule E(4)(f).

Upon a motion to vacate the attachment, the plaintiff bears the burden to show, *inter alia*, that it has a "valid prima facie *admiralty* claim against the defendant."[2] *Aqua Stoli*, 460 F.3d at 445 (emphasis added). If the plaintiff satisfies its burden and meets the filing and service requirements of Supplemental Rules B and E, the attachment must be upheld, except in limited circumstances that are not relevant here.[3] *See id.* at 445.

While, on a Rule E(4)(f) vacatur motion, courts in this district have consistently declined to conduct a full-fledged inquiry into the merits of the plaintiff's allegations, *see, e.g.*, *Chiquita Int'l Ltd. V.M. v. Bosse,* 518 F. Supp. 2d 589, 597 (S.D.N.Y. 2007), the Circuit's recent decision in *Williamson v. Recovery Ltd. Partnership*, 542 F.3d 43, 52-53 (2d Cir. 2008), makes clear that a district court may properly look beyond the pleadings when considering such a motion. *See also SPL Shipping Ltd. v. Gujarat Cheminex Ltd.*, 06 Civ. 15375, 2008 WL 4900770, at *1 (S.D.N.Y. Sept. 10, 2008) (finding that *Williamson* "stand[s] for the proposition that a district court does not abuse its discretion when it considers evidence outside of the pleadings on a motion to vacate an order of attachment."). Therefore, to determine whether Plaintiff has stated a prima facie admiralty claim, this Court looks beyond the four corners of the pleadings to the contracts, declarations and other exhibits submitted by the parties in connection with the instant motion.

### III. DISCUSSION

Defendant argues that the attachment must be vacated because Plaintiff's claim is not an "admiralty" or "maritime" claim, as required by Supplemental Rule B. Defendant reasons that Plaintiff's cause of action arises from a sales contract, not a charter party, and the relationship

---

[2] The plaintiff also must show that the defendant cannot be found within the district, the defendant's property may be found within the district, and there is no statutory or maritime law bar to the attachment. *See* 460 F.3d at 445. These requirements are not disputed here.

[3] The "other limited circumstances" in which vacatur is appropriate occur when

> 1) the defendant is subject to suit in a convenient adjacent jurisdiction; 2) the plaintiff could obtain *in personam* jurisdiction over the defendant in the district where the plaintiff is located; or 3) the plaintiff has already obtained sufficient security for the potential judgment, by attachment or otherwise.

460 F.3d at 445.

between the parties was that of buyer and seller, not shipowner and charterer, as is most often the case in such *ex parte* attachments pursuant to Rule B.

However, a claim need not assert a breach of a charter party to be "maritime" in nature. The threshold question, instead, is whether the underlying transaction giving rise to the claim had maritime commerce as its principal objective. The Supreme Court explained in *Norfolk Southern Railway v. James N. Kirby, Pty Ltd.*, 543 U.S. 14 (2004), that

> [t]o ascertain whether a contract is a maritime one, we cannot look to whether a ship or other vessel was involved in the dispute, as we would in a putative maritime tort case. . . . Nor can we simply look to the place of the contract's formation or performance. Instead, the answer depends upon . . . the nature and character of the contract, and the true criterion is whether it has reference to maritime service or maritime transactions.

*Id.* at 23-24 (quotation marks and citations omitted). Earlier this year, the Second Circuit affirmed that "the proper inquiry is 'whether the principal objective of a contract is maritime commerce.'" *Williamson*, 542 F.3d at 49 (quoting *Folksamerica Reinsurance Co. v. Clean Water of N.Y., Inc.*, 413 F.3d 307, 315 (2d Cir. 2005) (quotation marks and citation omitted)).

The Supreme Court described *Norfolk* as "a maritime case about a train wreck." 543 U.S. at 18. The *Norfolk* Court held that the train wreck was sufficiently connected to the intermodal scheme of transport agreed upon by the parties that the claims arising out of it were related to maritime commerce. Because the parties' contract provided that the goods would travel by land and by sea, and the train wreck affected the maritime leg of the trip, the claim was "salty." *Id.* at 22, 25-26. The Court recognized that, generally, its cases "do not draw clean lines between maritime and nonmaritime contracts," and that the "boundaries of admiralty jurisdiction over contracts" are "conceptual rather than spatial." *Id.* at 23 (quotation marks and citation omitted).

Claims may arise out of contracts that contain both maritime and nonmaritime elements, such as the Sale Contract and Amendment here. The Second Circuit has recognized two instances where such "mixed" contracts are subject to the district court's admiralty jurisdiction: where "the claim arises from a breach of maritime obligations that are severable from the non-maritime obligations of the contract," and where, despite the mixed nature of the contact, "the principal objective of a contract is maritime commerce." *Folksamerica*, 413 F.3d at 314-15 (citation omitted).

Recently, in *Williamson*, the Circuit held that the plaintiffs' claim was "maritime," even though the claim did not involve a charter party, but rather non-compete agreements, non-disclosure agreements and an equipment lease agreement. 542 F.3d at 49. The plaintiffs in

5

*Williamson* had assisted the defendant in the location and recovery of a sunken steamship, and they alleged that the defendants had failed to pay their share of the value of gold, silver and artifacts that were recovered from the shipwreck, in violation of their agreements. *Id.* at 47. The Circuit held that because the parties had entered into the contracts in connection with a maritime commercial venture, the contracts were maritime in nature and the plaintiff had brought an "admiralty" claim for the breach of those contracts. *Id.* at 49.

Courts in this circuit have found a variety of different types of agreements to be maritime contracts and thus capable of giving rise to an "admiralty" claim and the *ex parte* attachment sought to be vacated here. *See CTI-Container Leasing Corp. v. Oceanic Operations Corp.*, 682 F.2d 377, 380-81 (2d Cir. 1982) (agreements for the acquisition of ship equipment, such as radios and radar, and a lease of cargo containers for use on a ship were maritime contracts); *Sirius Ins. Co. v. Collins*, 16 F.3d 34, 36 (2d Cir. 1994) (holding that a policy of marine insurance served "the protection of maritime commerce" and thus a claim based on the theft of the vessel was "maritime"); *C. Transp. Panamax, Ltd. v. Kremikovtzi Trade E.O.O.D.*, No. 07 Civ. 893, 2008 WL 2546180, at *2 (S.D.N.Y. June 19, 2008) (an agreement to guarantee of the performance of a maritime contract was maritime in nature). Generally, therefore, where "the subject matter of the contract relat[es] to a ship in its use as such, or to commerce or to navigation on navigable waters, or to transportation by sea or to maritime employment, it is fairly said to constitute a maritime contract." *Ingersoll Milling Mach. Co. v. M/V Bodena*, 829 F.2d 293, 302 (2d Cir. 1987) (quotation marks and citation omitted).

On the other hand, claims have been dismissed for lack of subject matter jurisdiction where the underlying contract was "exclusively nonmaritime." *See Project Hope v. M/V IBN SINA*, 250 F.3d 67, 73 n.3 (2d Cir. 2001) (contract that related only to the portion of a journey that was over land did not give rise to a maritime claim); *Mediterranean Shipping Co. v. Rose*, No. 08 Civ. 4304, 2008 WL 4694758, at *1 (S.D.N.Y. Oct. 23, 2008) (dismissing action where the contract on which plaintiffs brought suit pertained solely to overland transportation).

**Plaintiff's Claim Is "Maritime"**

Here, Plaintiff claims that Defendant breached the demurrage provision of the Sales Contract and Amendment by failing to pay the agreed-upon $20,000 per day penalty for the time that the M/V SEABOSS 1 was detained at port in Berbera, Somalia. It is well-settled that demurrage clauses are "maritime" in nature because they "remunerat[e] the shipowner for the detention of its vessel beyond the number of days allowed by the charter-party," and thus have a

sufficient connection to maritime commerce. *Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp.*, 204 F.3d 384, 386 n.2 (2d Cir. 2000); *see also Mediterranean Shipping*, 2008 WL 4694758, at *3 ("Admiralty jurisdiction has . . . been found over actions for the recovery of demurrage or detention charges pursuant to a contract for the carriage of goods by water."); *Luckenbach S.S. Co. v. Berwind-White Coal Mining Co.*, 7 F.2d 793, 795 (2d Cir. 1925) (holding that court has admiralty jurisdiction over claim for demurrage pursuant to charter party); *C. Transp. Panamax*, 2008 WL 2546180, at *3 (settlement agreement that obligated party to pay demurrage on a theretofore uncompleted charter gave rise to admiralty claim, even though settlement agreements usually are not maritime in nature).

      Defendant contends that the provision in the Sales Contract and Amendment was mislabeled as a "demurrage" clause because demurrage is, by definition, compensation paid by the charterer to the shipowner, and here Plaintiff is not a shipowner and the parties had only a buyer-seller relationship.  Defendant's argument is unavailing.  The demurrage provision in the Sales Contract and Amendment was taken from the charter party that Plaintiff entered into with the shipowner; indeed, the Sales Contract and Amendment make reference to the Gencon Charter Party form.  Plaintiff explains that "[i]f there was simply any delay to the vessel in discharge, the money was going to be collected from the buyers and pass through to the shipowner," and that, while "[d]emurrage by definition is remuneration to the shipowner[,] [i]n this case the same amount was collected from the buyer and paid to the shipowner."  (Tr. of Oral Argument 6:18-20, 10:8-14.)  Thus, the demurrage provision in the Sales Contract and Amendment appears to have operated as an indemnity, so that Defendant, as buyer, would pay any demurrage owed by Plaintiff, as seller and charterer, to the nonparty shipowner.

      This case is distinguishable from *Aston Agro-Industrial AG v. Star Grain Ltd.*, No. 06 Civ. 2805, 2006 WL 3755156 (S.D.N.Y. Dec. 20, 2006), on which Defendant relies.  In that case, Judge Daniels vacated an *ex parte* order of attachment where the plaintiff claimed breach of a demurrage clause in a sales contract.  Unlike this case, there was no evidence that the plaintiff had to pay demurrage to the shipowner.  *Id.* at *1.  Moreover, Judge Daniels found it "noteworthy" that the contracts provided for arbitration before the Grain and Feed Trade Association, not a maritime organization.  *Id.* at *4, n.5.  Here, the dispute was decided by a member of the London Maritime Arbitrators Association.  Finally, Judge Daniels observed that while the arbitral panel had found the defendant liable to the plaintiff, it did so not because the defendant had breached any maritime obligation under the contracts or because the defendant

7

caused the demurrage, but only because the contracts were on "C.I.F. Free Out" terms, which meant that the risk of loss passes to the buyer at the point of shipment. *Id.* at *4. Here, the Arbitrator expressly found that Defendant was liable to Plaintiff for demurrage due to the detention of the vessel at port.

More recently, in *Centramet Trading S.A. v. Egyptian American Steel Rolling Co.*, No. 07 Civ. 6379, 2007 WL 5731922 (S.D.N.Y. Sept. 28, 2007), Judge Berman found that a demurrage clause in a sales contract was a "significant maritime component" because it required the defendant-buyer to pay demurrage to the plaintiff-seller "per the Charter Party covering the respective voyage." *Id.* at *1. Recognizing that "[d]emurrage claims clearly fall within the court's admiralty jurisdiction," the court held that the plaintiff had a valid prima facie admiralty claim against the defendant because the demurrage clause was severable from the non-maritime obligations of the contract." *Id.* at *1-2 (quotation marks and citation omitted).

Similarly, here, the demurrage clause created a maritime obligation because it required Defendant to pay Plaintiff any demurrage costs that Plaintiff would have to pay to the shipowner pursuant to the charter party. Plaintiff's claim arises solely from the demurrage clause, which is severable from the rest of the Sales Contract and Amendment. The principle objective of the demurrage clause was maritime commerce, as it effectively required the buyer to indemnify the seller for demurrage owed to the shipowner. The Sales Contract and Amendment refer to the Gencon Charter Party and set forth requirements relating to the shipment by sea. The Amendment mentions the vessel by name. The dispute was decided in maritime arbitration in London. Therefore, "borrowing from Justice Harlan, . . . 'the situation presented here has a more genuinely salty flavor than that [argued by the Defendant].'" *Norfolk*, 543 U.S. at 22 (quoting *Kossick v. United Fruit Co.*, 365 U.S. 731, 742 (1961)).

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion to vacate is DENIED. The Clerk of the Court is instructed to close this motion and remove it from my docket.

IT IS SO ORDERED.
New York, New York
December 4, 2008

_____
U.S.D.J.

8